EDWARD A. WALSCHE et al., complainants,

*v.*

THOMAS J. SHERLOCK et al., defendants.

[Decided March 24th, 1932.]

*Mr. Norbury C. Murray,* for the complainants.

*Mr. Saul Nemser,* for the defendants.

BERRY, V. C.

The complainants are four members of Local No. 11 of the International Association of Bridge, Structural and Ornamental Ironworkers, which is an unincorporated labor union having its principal office at 60 Branford Place, Newark, New Jersey. The territory over which this local exercises jurisdiction is that including the counties of Essex, Union, Morris, Middlesex and parts of the counties of Passaic, Hudson, Somerset and Sussex. The defendants are Samuel McKee, president; John J. O'Neill, financial secretary; Thomas J. Sherlock, business agent; Peter Roth, Daniel Flynn, John Duffey, George Cowan and Thomas Eagleson, members of the executive committee and Paul Van Esten, treasurer and recording secretary of Local No. 11.

The complainants seek to restrain the above named officers of Local No. 11 from using what is commonly known as the "permit" and "card index" system, or, if permitted to use said system, restraint from discrimination against the complainants and other members of the local by said officers. The bill alleges that "under the 'permit' system the members of the local union were permitted to seek employment * * * but could not commence work without having first procured from * * * Sherlock, or his assistant, a permit authorizing him to accept such employment from the particular employer and on the particular piece of work for which he had secured employment; the result was that without such a permit a member of the local could not obtain actual employment any-

where within the territory covered by such Local No. 11, nor could he obtain employment in the territory of any other local in New Jersey or elsewhere without either a permit from the said Sherlock or a transfer out of his union, which transfer became operative so as to permit the workman to obtain employment in the territory of such other local, only if and when he was accepted by the other local union in whose jurisdiction he proposed to work."

The bill further alleges "that under the 'card index' system employers desiring workmen were to communicate with the office of the local, listing their requirements; the members desiring employment were to report at the office of the secretary of the local, and a card index of those so reporting was to be kept, and employment, as it became available, was to be assigned and given to them in the order, in point of time, in which they had so registered or 'checked in,' as it was called; such assignment of employment was evidenced by a permit to that effect, so that the employer or contractor would not employ any man unless he produced a permit from the local, signed by Thomas J. Sherlock or John J. O'Neill, permitting such workman to work for that particular employer on that particular work." It is charged that before the installation of the card index system the defendant Sherlock used the permit system in a wholly arbitrary manner, granting or refusing to grant permits according to his own caprice and that that system was used by him without any supervision, rules or regulations; that the card index system was inaugurated in an attempt to abolish or curtail Sherlock's arbitrary powers thus assumed; and to insure equality in the distribution of employment amongst the members. It is further charged that the card index system has completely failed of its purpose because the defendants Sherlock and O'Neill have not administered it honestly, but, on the contrary, have fraudulently exercised it so that favoritism has resulted and friends and supporters of Sherlock and O'Neill have been assigned to the best jobs while the complainants and others opposed to the regime of Sherlock and O'Neill have been either left without work or assigned to the more dangerous

and less lucrative jobs. Other abuses of the system and illegal practices by the defendant officers are charged in the bill. The defendants deny any abuse of the system and any fraudulent or illegal practices and claim to have administered the permit and card index systems with absolute honesty and without favoritism. Generally speaking, however, I think that substantially all of the allegations of the bill of complaint are sustained by the evidence although the defendants had not, at the time of the suspension of the final hearings, put in all their proof with respect to the misuse of the card-index-permit-system. But all the principal defendants had testified and as the testimony stands I am inclined to believe that complainants' evidence presented the true picture. However, another defense interposed, and the one with which we are now more particularly concerned, is that this court is without jurisdiction in the premises because the complainants have not exhausted the remedies within the organization provided by its constitution.

It is admitted by the complainants that they have not exhausted these so-called remedies but they claim they are not obliged to do so because the pursuit of them would be futile and would amount to a denial of justice, and that if their compliance with the card-index-permit-system is required because of their contract of membership, such contract is void as violative of their constitutional right to freely dispose of their own labor, and the constitutional rights of employers anxious to employ them, to the free flow of labor to such employers.

After ten days had been consumed in the final hearing of this cause it was decided to suspend further hearings until the legal questions raised by the pleadings and by counsel during the course of the trial, especially the defense of non-exhaustion of remedies within the association, were decided.

In disposing of these questions it should be borne in mind that this is not a controversy between "labor" and "capital," such as is usually involved in injunction suits concerning labor unions; it is a strife within the union aligned on one side of which are the four complainants, representing a con-

siderable portion of its membership, and on the other, certain members and officers of that union who are so-called "labor leaders" and who have the active support of the international officers. The union itself is not a party to these proceedings and is involved only because the defendants in their answer invoke the provisions of the constitutions of the local, the district council and the international. The particular section of the international constitution which is invoked is section 2a of article xvii, which reads as follows:

"No officer or member of our International Association or its local unions shall resort to court proceedings of any description in any matter pertaining to this organization, its local unions or his membership until all remedies provided for within our International Association and local laws have been fully exhausted. Violation of this section shall be sufficient cause for expulsion from membership in this International Association and its local unions."

The general rule is that the provisions of the constitution and by-laws of a voluntary association become a part of the contract entered into by a member when he joins that association, and this rule is not in dispute. It is also a general rule of law that in controversies between a member and the association the remedies within the organization provided in the constitution and by-laws must be exhausted before appeal to the courts. The New Jersey rule has been recently restated by our supreme court in *Emma* v. *Loggia Fasci Italici, No. 16, &c. (1929), 7 N. J. Mis. R. 387,* as follows:

"The rules applicable to this class of cases were formulated by former Mr. Justice Van Syckel of this court, in the case of *Roxbury Lodge* v. *Hocking, 60 N. J. Law 439* (at *pp. 440, 441*), and may be stated as follows:

"1. Where the question is a social one, involving discipline or the conduct or standing of a member, he must exhaust his remedy within the organization if such remedy is provided before invoking the aid of courts of law. See *Grant* v. *Ancient Order of Foresters, 75 N. J. Law 109; Zeliff* v. *Knights of Pythias, 53 N. J. Law 536.*

"2. But if the controversy involve property rights, then in the absence of regulations amounting to an express agree-

ment to exhaust remedies within the order, the courts will intervene to protect such property rights. *Byrne* v. *Supreme Circle, 74 N. J. Law 258,* was a case in this class.

"3. On the other hand, even if property rights are involved, still if the rules of the organization provide a remedy within that body, and members have agreed to exhaust that remedy before application to the law courts, the latter will not interfere until that remedy has been exhausted. *Ocean Castle* v. *Smith, 58 N. J. Law 545; affirmed, Smith* v. *Ocean Castle, 59 N. J. Law 198.*

"4. But in case of property rights it should be clear that these are cognizable by the tribunals established within the order. *Roxbury Lodge* v. *Hocking, supra.*"

See, also, *O'Brien* v. *Musical Mutual P. & B. Union, 64 N. J. Eq. 525; Grand Lodge, &c.,* v. *Gaddis, 65 N. J. Eq. 1; Societa di Mutuo Soccorso, &c.,* v. *Cenni, 62 N. J. Law 652; Purcaro* v. *Grand Lodge, &c., Order Sons of Italy (Court of Errors and Appeals, 1930), 107 N. J. Law 82.*

Under some circumstances, however, the rule of exhaustion of internal remedies will not be enforced even where the requirement was assented to when the litigant became a member, as where the pursuit of those remedies would be futile, illusory and vain. *Lindahl* v. *Supreme Court, Independent Order of Foresters, 100 Minn. 87; 110 N. W. Rep. 358; 8 L. R. A. (N. S.) 916.* The requirement of exhaustion of remedies was there considered a denial of substantial justice because the tribunal of final appeal would not meet for three years. In *Kane* v. *Supreme Tent, &c., 113 Mo. App. 104; 87 S. W. Rep. 547,* a delay of two or three years before the final tribunal met was considered sufficient to excuse the exhaustion of remedies within the order; and in *Brown* v. *Supreme Court, Independent Order of Foresters, 176 N. Y. 132; 68 N. E. Rep. 145,* the rule was held not to apply where no meeting of the tribunal of last resort was to be held for over a year and then in a distant city; and generally, it is held that where the appeal would be futile the remedies within the order need not be exhausted because "the law does not require a vain form." *Barbrick* v. *Huddell, 245 Mass.*

*428; 139 N. E. Rep. 629; Correia* v. *Supreme Lodge of Portuguese Fraternity, &c., 218 Mass. 305; 105 N. E. Rep. 977; Malloy* v. *Carroll, 272 Mass. 524; 172 N. E. Rep. 790.* Although in *Mulcahy* v. *Huddell, 272 Mass. 539; 172 N. E. Rep. 796,* a possible delay of four years before the meeting of the tribunal of last resort was held not *of itself* sufficient to excuse compliance with the rule. See, also, generally on this subject, *Puleio* v. *Sons of Itala, &c., 266 Mass. 328; 165 N. E. Rep. 118; Snay* v. *Lovely (Mass.), 176 N. E. Rep. 791; Fritz* v. *Knaub, 103 N. Y. Supp. 1003; Corregan* v. *Hay, 87 N. Y. Supp. 956; Local Lodge No. 104, &c.,* v. *International Brotherhood of Boiler Makers, &c., 158 Wash. 480; 291 Pac. Rep. 328; Rueb* v. *Rehder, 24 N. Mex. 534; 174 Pac. Rep. 992; Smith* v. *South Slavonic Catholic Union, 99 W. Va. 256; 128 S. E. Rep. 306.* The exceptions to the general rule requiring an exhaustion of remedies are best stated in *19 R. C. L. 1231 § 41,* as follows:

"So a member is justified in neglecting to exhaust his remedies within the order where it appears that an opportunity to present his claim and have a fair determination of it has been denied by the very conduct of the association itself, or where the means of redress afforded within the organization are unreasonable in their nature. Thus although the constitution and by-laws of an association provide for the submission of controversies between it and its members to various courts and tribunals within the order, and expressly declare that no member shall be entitled to bring any civil action or legal proceeding until he shall have exhausted all the remedies so provided, if the manner in which the courts are organized and the expense and delay incident to the proceedings are obstacles that amount almost to a denial of justice, and if it appears that adequate redress cannot be obtained from the internal tribunals, there may be a resort to the civil courts in the first instance."

The defendants contend that the following remedies were open to the complainants and that none of them have been pursued:

1. Appeal to the district council. (This is said to be an independent remedy and not mandatory.)

2. Appeal to the general president.

3. Appeal to the general executive board.

4. Appeal to the general executive council.

5. Appeal to the regular convention.

The last four of these remedies are claimed to be mandatory. In order to determine just what internal remedies are available to the complainants it is necessary that the provisions of the constitutions referred to by counsel for the defendants be examined, and they must be strictly construed. *Carey* v. *Switchmen's Union of North America, 98 Minn. 28; 107 N. W. Rep. 129.*

## 1. APPEAL TO THE DISTRICT COUNCIL.

The only provision in the constitution and by-laws of the district council which might be said to confer a right of appeal upon the complainants is article xi, section 1, which reads in part as follows:

"Whenever a charge is preferred against any local unions, or member of this council, it should state specifically the offense alleged to have been committed, the name and number of witnesses to such offense, same to be signed by the person or persons making such charges, the same to be stated at a regular meeting of the council."

Only local unions can be members of the council. Article ii, section 1. The reference to "members" in this section must, therefore, mean local unions; but if it is construed to mean members of local unions it does not help the defense as it provides only for charges *against,* not *by,* such members. No express right to prefer charges is given to anyone. The inference that complainants have a right to appeal to the district council or to prefer charges before it against Local No. 11 would be a strained one. It is true that some officials of the local and international have testified that such right existed, but their assertion of the right does not create it. If the right exists it must be found in the constitution and by-laws themselves. If not there, then the privilege, if extended to the complainants, is a matter of grace and not of right. This alleged remedy is, therefore, not a remedy at all and complainants were not obliged to appeal to the district council before coming into this court.

## 2. APPEAL TO THE GENERAL PRESIDENT.

This is said to be authorized by article ix, sections 1 to 17, inclusive, and particularly by sections 2, 7, 8, 9, 10, 11, 12 and 15. I have read the complete constitution and particularly article ix with care and I find no specific authority in any section thereof authorizing such appeal. An inference of such right of appeal to the president by a member of a local would require a strained construction. Broad powers of supervision are conferred upon the president to act on his own initiative, but he is not *bound* to act on the complaint of anyone. If he does act, then an appeal lies from his decision, first, to the general executive board; second, to the general executive council, and third, to the regular convention. But so far as this article of the constitution is concerned, and I am not referred to any other in this regard, the complainants could not, of right, have complained to the general president of their grievances. If they did so complain, as Walsche claims he did, the president could, with impunity, ignore the appeal, as in fact he did. The testimony of the officials of the international respecting the right of such appeal creates no such right where none otherwise exists.

## 3. APPEAL TO THE GENERAL EXECUTIVE BOARD.

Article xii, section 3, provides that the general executive board "shall decide all points of law, grievances and appeals referred to it by the general president or otherwise properly coming before it. * * * Upon all matters not otherwise specifically provided for herein the general executive board shall have full power to act." Article vii, section 3, provides that meetings of the general executive board are held "when necessary, *at the call of the general president,* to consider appeals from members and local unions, and transact such other business as may need attention." If either of these sections provide a remedy of which the complainants might avail themselves, I fail to find it. Broad powers are given to the board itself, but not to individual members of the

locals. If complaints are made, they may be considered as a matter of grace, but not of right; and it is to be noted that the meetings of this board are held "when necessary" at the call of the president. There is no assurance to the complainants that the president would *ever* call a meeting. The testimony of the officials as to the custom which has been followed in the past does not create a right in the complainants which they could enforce where none otherwise exists.

#### 4. APPEAL TO THE GENERAL EXECUTIVE COUNCIL.

The general executive council is composed of nine general vice-presidents, the general president and the general secretary. They are required to meet at least twice a year, oftener when necessary, and on call of the general president, "to consider such matters as have been referred to them or .that may properly come before them." Article xiii, section 1. The council "shall decide all appeals coming before it from the general executive board and decide all other matters properly coming before it." Its decisions shall be final unless reversed by the regular convention. Article xiii, section 4. It will be seen that this board has no original jurisdiction to hear complaints. It is an appellate body only, and article xiii confers no right of appeal upon anybody. It gives the council "power to hear appeals from the general executive board" and to decide other matters properly coming before it. What those other matters may be is left open to conjecture.

#### 5. APPEAL TO THE REGULAR CONVENTION.

I have been referred to no provision in the constitution which confers the right of appeal to the general convention upon anyone, and I find no such provision except in article vii, section 10, and article xvii, section 8. Article vii, section 10, provides for an appeal by an officer or member suspended or removed. Obviously this provision does not apply to the present controversy, as the complainants have

been neither suspended nor removed. Article xvii, section 8, provides that "charges may be preferred *against* any local union, officer or member" of an international for a variety of offenses. Such charges are to be filed with the general president who is to determine if they justify a trial. If in his opinion they do they are to be heard by the general executive board collectively or by a representative of that board. After decision the board may sentence "as it may deem appropriate." An appeal lies from this decision and sentence to the general executive council and then to the convention. Who is to have the right to prefer such charges does not appear. No express right is given to members to do so. Article xviii, section 12, provides for the filing of charges against local unions with the general president. By whom are such charges to be preferred? Certainly not by members of the locals. No such *right* is given. All these provisions are contained in that portion of the constitution devoted to .the international and respecting the powers and duties of its officers and governing bodies, and not to the locals. It is a fair inference that these provisions relate to action by the international only and to charges by the international officials *against,* and not *by,* local unions and their members.

A careful reading of the international constitution shows that while broad powers are conferred upon international officers, the executive board and executive council, few rights except the right to pay dues and obey the will of the international, are given to the individual members. The primary design of the constitution of the international seems to have been to confer arbitrary and despotic power upon its officers, and to subjugate the locals and their members to the absolute will of its officers. True, the officers, board or council may graciously listen to an appeal for justice from a member, but they might just as ungraciously refuse to listen so far as the provisions of the constitution are concerned, and the suitor would have no alternative but to submit if he could not appeal to the courts. The remedies which members of voluntary associations must exhaust before appealing to the

courts are remedies of right and not of grace. An examination of the New Jersey cases applying the general rule of exhaustion of remedies will show that in every case the remedies involved were those of right guaranteed by the basic law of the association. The same is true of *Clark* v. *Morgan, 271 Mass. 164; 171 N. E. Rep. 278,* and other Massachusetts cases relied upon by counsel for the defendants. Also in most of such cases the membership rights of expelled or suspended members were involved. In the "constitution of the International Association of Bridge, Structural and Ornamental Iron Workers" there is found no bill of rights for the members. The objects of the association are stated to be "to encourage and develop a higher standard of skill, to cultivate feelings of friendship among the craft, to equitably distribute opportunities of employment, to secure by legal and proper means pay commensurate with the hazard, physical and mental taxation and exhaustion and average life endured by its members in performing services of the trade, to discourage piece-work and promote safe and reasonable methods of work, to cultivate the moral, intellectual and social conditions for the well-being of all its members, their families and dependents and in the interest of a higher standard of citizenship." Article iii. These are high sounding phrases, voicing laudable objects, but aside from this article I find little in the whole constitution dealing with the welfare of the members themselves except article xvi, relating to death claims, and article xxv, covering old age and disability pensions, which, considering the dues paid, are meagre enough. The constitution is for the most part made up of "shalt nots," except as it confers despotic powers upon the international officers. Such despotic power centered in any individual or group of individuals and which may be used as a means of oppression is repugnant to the fundamental principles of democracy upon which our government is founded.

In my judgment, the international constitution provides no "remedies of right" which the complainants are obliged to pursue before instituting action in this court. The remedies of right existing in the local are those provided in article xxvi, section 13, as follows:

"CHARGES.

"Paragraph 1. Charges can be made against any member for violation of the Local Union rules. Said charges shall be made before the Local Union and shall be heard before the Executive Committee or a jury, whose decision shall be final.

"Par. 2. All officers shall be tried by a jury of twelve members in good standing. They may be allowed to retain any member of the Local Union in good standing for counsel, and will be allowed a fair and impartial trial for any charges which may be preferred against them; and their verdict shall be final.

"Par. 3. Any member preferring a charge against another for the purpose of maliciously or otherwise injuring such a member, shall be liable to fine or suspension, or both, and may be expelled from the Local Union. All charges shall be in writing, and proper notice be given the accused.

"Par. 4. The jury shall be selected from the members of the Local Union in good standing. Each member shall have nine (9) peremptory challenges. The President of the Local Union shall perform the duties of judge at all such trials. In the absence of the President, the Vice-President shall preside.

"Par. 5. To prefer charges against any officer of this Local Union for misdemeanor, it shall require the signature of fifteen (15) members in good standing to a petition, when said officer shall appear at a special meeting for trial. Any member or officer who shall have charges preferred against him shall appear on being notified to do so, for trial. Failure on their part to do this shall subject them to expulsion or other penalties.

"Par. 6. An appeal can be taken from any decision of the Executive Committee or jury within two weeks after the decision has been rendered."

Here is set up within the local a judicial tribunal presided over by the president, as judge, and the executive committee or twelve members as a jury. Who is to select the jury, if one is chosen, is not stated, but *"their verdict shall be final."* Paragraph 2. If no jury is selected "charges" are heard before the president and executive committee. Within two weeks after decision by that committee an appeal may be taken, but to what tribunal we are not informed, and nowhere do I find any provision for the hearing of such appeal. This tribunal might, under certain circumstances, assuming it to be a lawful body, deprive the members of valuable property rights, especially where the decision would result in the expulsion of the member. And it is important to note that if the controversy is heard before a jury of members "their

verdict shall be final." In *State Council, &c.,* v. *Enterprise Council, No. 6, 75 N. J. Eq. 245* (at *p. 252*), Mr. Justice Swayze, speaking for the court of errors and appeals, quoted from the opinion of the court in *Austin* v. *Searing, 16 N. Y. 112*, as follows:

"The effect of some of the provisions of these constitutions is to create a tribunal having power to adjudicate upon the rights of property of all the members of the subordinate lodges, and to transfer that property to others; the members of this tribunal being liable to constant fluctuations, and not subject in any case to the selection or control of the parties upon whose rights they sit in judgment. To create a judicial tribunal is one of the functions of the sovereign power, and although parties may always make such tribunals for themselves, in any specific case, by a submission to arbitration, yet the power is guarded by the most cautious rules. A contract that the parties will submit confers no power upon the arbitrator, and even where there is an actual submission it may be revoked at any time. The law allows the party, up to the last moment, to ascertain whether there is not some covert bias or prejudice on the part of the arbitrator chosen. It would hardly accord with this scrupulous care to secure fairness, in such cases, that parties should be held legally bound by the sort of engagement that exists here, by which the most extensive judicial powers are conferred upon bodies of men whose individual members are subject to continual fluctuation."

In so far as the provisions of article xiii might be said to be compulsory and final as respects property rights of members I am of the opinion that they are void and unenforceable. But in considering the alleged obligation of the complainants to exhaust this remedy a recital of what they have actually done in their quest for justice may be enlightening. The facts, as I find them from the evidence, are as follows:

In April or May of 1929, the Local No. 11 voted to abolish the card-index-permit-system, by a vote of three hundred and nine to four. It also appointed a committee consisting of Dunn, Branan and Eagleson to have the card index system

.abolished or at least modified. Pursuant to that resolution the committee attended the district council, which would not receive them, owing, as Kenney says, to the fact that the executive board of Local No. 11 sent word to the district council that such committee was not a member of the executive board and had "no standing or credentials to be there."

Due to the fact that that vote of the local's was ignored and the system continued, the card index system in September of 1930, on recommendation of the executive committee of Local No. 11, was voted out for ninety days, and the permit system was voted out for ninety days in October, 1930. In November of 1930 the international's officers ordered both systems restored and suspended the meetings of the local. These meetings are still suspended and the membership is thus deprived of any opportunity to collectively discuss or .act upon the matters in controversy.

In June of 1930 a petition, signed by about twenty-six members was sent to the international, complaining of the card index system and its operation. This was never acknowledged and no action was ever taken in respect to it so far as the testimony shows. Morrin, the general president of the international, in the fall of 1930, at the Governor Clinton Hotel in New York, called Walsche's attention to the necessity of exhausting his remedies within the organization and Walsche called his attention to the petition sent to him in June and that they had been ignored, to which Morrin replied, "I have got frequent letters and have not been able to get around, &c., &c.," * * * "these complaints have been coming in from Local No. 11 the last two years, I have got stacks of them that high [indicating about six inches], of course, I have not been able to get around to take care of them."

International Officer McCain says that a meeting of the general executive board was held in the Governor Clinton Hotel in November, 1930, which was attended by the officers and executive board of the local and some of the local members for the purpose of ascertaining the facts pertaining to

the existing difficulties in the local and to try to bring about peace and harmony; that the members were questioned by the general executive board which then went into executive session and ordered the meetings suspended and that the card index system be continued until further notice, and that all members of the locals must comply strictly therewith.

The result of Erwin and Cohen, in the spring of 1930, preferring charges on the floor of the meeting against certain officers of the local for unfairly manipulating the card index system, was that Cohen was beaten up by Flynn. Criminal complaint was then made against Flynn and he was convicted and sentenced to three months in jail. After Flynn was indicted and before he was tried Cohen and the other witnesses against Flynn were summoned by Morrin to New York and were told by Morrin in the presence of Sherlock, O'Neill and possibly Johnson that if Cohen and the other witnesses against Flynn did not drop their criminal charges against him that they would be thrown out of the union. After the Flynn criminal trial Cohen and the witnesses against Flynn were haled before the executive board and the local officials and were asked if they had testified in the Flynn trial. Afterwards Morrin told O'Neill to drop the matter.

Specific complaint of the card index system was made by letter dated March 16th, 1930, by Mr. Van Huss, addressed to P. J. Morrin, the general president. McCain admits that it may have been received and misplaced and in any event he made no reply to it. (It is to be noted that as the letter was addressed to Morrin he would presumably be the one to receive it rather than McCain, and that Morrin did not see fit to testify.) No action was taken in regard to it.

The attitude of the defendants, and of the international officers who support their stand in this controversy is entirely arbitrary. They evince no desire to insure an equitable working of the card-index-permit-system. During the course of the final hearing the court suggested the installation of certain safeguards which then seemed, but probably were not, adequate. But so far as the defendants were concerned they fell upon deaf ears although complainants were willing..

This attitude is best reflected in the words of counsel for the defendants during a colloquy had between counsel in open court respecting a proposed settlement of the controversy, as follows:

"Mr. Murray—Our position on this proposition is just this. We are willing to settle this case right now on these terms; first, that we give this card index a trial for sixty or ninety days or six months, provided that at the end of it the union have the right, or rather, the membership have a right to vote to retain the system as it then is, or abolish it entirely, that decision to be final and binding on the union for a period of two or three years so that there will be no more controversy over this.

"Mr. Nemser—That is absolutely absurd. They are going to make terms with us? They are going to impose terms on the international itself? Ridiculous. The international imposes terms upon them. This case will never be settled if that is the case."

What hope could the complainants have for an impartial trial presided over by anyone displaying such prejudice? And, as I have suggested, the attitude of counsel is but a reflection of the attitude of those they represent.

In *Correia* v. *Supreme Lodge of Portuguese Fraternity, &c., supra,* the court said:

"Of course, the plaintiffs would not be bound to go through a useless formality or to seek for justice at the hands of a tribunal which had prejudged the matter in issue."

And in *Malloy* v. *Carroll, supra,* the court said:

"The law does not require a vain form. It will not in such a case as here make a mockery of justice by requiring a party to submit his cause to a tribunal from which he cannot expect the impartiality he may rightfully demand."

The right to file this bill is determined as of the date on which it was filed. At that time no regular convention was scheduled to be held for two years and the place of its meeting, if and when called, had not then been selected. It might meet in San Francisco, or outside the United States, at a point so remote that there would be no possibility of these

complainants attending to prosecute their appeal. Walsche's complaint to the general president made in June, 1930, remained unnoticed at the time this bill was filed; and the general executive board has already prejudged the case, and, it is evident, is determined to keep the control of the unions in the present officials and enforce the card-index-permit-system, come what may.

But assuming that the international officials might graciously extend to these complainants the right to the successive appeals mentioned, when the attitude of the international officers in this particular controversy, the probable necessity of pursing all four appeals to the end, the uncertainty as to the time and place of holding of the next regular convention at which the final appeal might be heard, the delay and expense necessarily incident to these successive appeals, the financial ability of the complainants, the loss in wages likely to be suffered by them in pursuing their so-called remedies, and their inability to compel the attendance of witnesses before the appellate tribunals, together with the fact that Walsche's appeal to the general president had passed unnoticed, are all considered, it is apparent that this cumbersome procedure, if pursued, would amount to a denial of justice even if the complainants were successful on their last appeal. Five appellate remedies are claimed to be open to the complainants. The very number of these so-called remedies and the alleged necessity of their complete exhaustion justifies this statement. And if five such appeals may be required, why not twenty-five? The increased number of successive compulsory appellate remedies would certainly tend to the exhaustion of the complainants which suggests itself as the design of the author of this constitution.

I am of the opinion, therefore, that the pursuit of these so-called remedies within the order by these complainants would have been futile, illusory and vain and that it was not, therefore, necessary for them to exhaust such remedies before appealing to this court.

But it is further argued on behalf of the complainants that article xvii, section 2a, has no application to the present con-

troversy. It is contended that the applicability of that section turns upon the construction to be given to the word "pertaining" and that as the rule of that section is invoked in an attempt at ouster of this court's jurisdiction, it must be construed strictly against such ouster. It is argued that as this action is by one set of individuals against another set as such, and as neither the international nor the local is a party to the suit, the action does not "pertain" "to the international, its local unions, or their membership," although they are incidentally involved; and further, that the words "pertains" and "involve" are not synonymous and that it is the defendants and not the complainants who have involved the organization by invoking the "card-index-permit-system" as a justification. Again it is argued that the use of the words "organization," "local unions" and "membership" in this section indicates that the court proceedings therein referred to are those brought to enforce *union created* rights and not to rights otherwise acquired. If this interpretation of that section is correct, and the argument appears sound, then it cannot be invoked in a controversy which concerns inherent rights under our state constitution as distinguished from those conferred by the international.

When the final hearings in this cause were suspended it was not my intention to pass upon the legality of the card-index-permit-system itself, or the members' contract with the union of which this system is claimed to be a part, but only upon the question as to whether or not the defendants were excused from exhausting their alleged remedies within the association before appealing to this court. But this legal question is raised by the pleadings and counsel have argued the point in their briefs and I shall, therefore, dispose of it, as it seems to me that it will be dispositive of the whole cause and will avoid the necessity of taking any further testimony or the submission of any further evidence. The question is a purely legal one and because of the wide public interest involved should be decided. Perhaps no cause has been heard in this court in recent years which has excited so much public interest or been the subject of as much comment in the

press and on the platform as the present suit. This was due to the exposure of the nefarious practices of the labor leaders acting in co-operation with contractors and employers, some willingly and others by coercion, resulting in the oppression of the workmen almost to the point of serfdom, and the mulcting of the public of thousands upon thousands of dollars to pay the price of organized graft and extortion in the guise of fines, commissions, and, what is probably a more correct term, tribute. The record is replete with testimony justifying this characterization. A recital in this opinion of the many incidents indicating such nefarious practices would serve no useful purpose, but "he who runs may read" and the book is open. The practices of the Iron League and the New Jersey Steel Board of Trade, in co-operation with the unions may be referred to as a shining example of conduct deserving the severest condemnation of every right-thinking citizen. To cover up some of these practices, which apparently would not stand the light of day, the former treasurer of the New Jersey Steel Board of Trade claimed the benefit of his constitutional right to refuse to testify on the ground that he might incriminate himself. But enough was already in the record to lift the veil. The public is vitally interested in putting a stop to such practices in the future. If they were, or the like evils are, in any degree, the result of the card-index-permit-system, or the members' contract of which it is a part, as it is alleged they are, the public has a vital interest in its abolition. There is no doubt in my mind that this system is one of the units of a much larger plan having for its object the monopolization of the labor market in the building trades and the unjust enrichment of unscrupulous labor leaders at the expense of the public and the workmen under their control. The welfare of the individual workman is of small moment to the racketeering labor leader who exploits his men to fill his own pockets. The oppression and exploitation of labor by so-called labor leaders shown by the evidence in this cause is a thousand-fold worse than that of capitalism which labor organizations were formed to resist. If unionism, that is, the cause of union labor, suffers from

the exposures in this cause, the result, however deplorable, will be directly chargeable against its unscrupulous leaders.

It is the contention of defendants that upon joining the union the complainants entered into a contract to be bound by the constitution, by-laws and rules of the local and the international; and that by reason of that contract the complainants are obliged to recognize and work under the card-index-permit-system until abolished in the manner provided in the constitution and by-laws. On the other hand, it is contended by the complainants that assuming that they have contracted, via the union, to abide by the card-index-permit-system, that contract is void because it is in violation of their rights under the constitution of this state; that the system is part and parcel of a scheme to monopolize the labor market in northern New Jersey; is in restraint of trade and against public policy and therefore void; that the defendants' answer invoking the rule of exhaustion of remedies is but an attempt to specifically enforce an illegal contract; that the complainants' right to work and earn a living is unalienable, and that any contract restrictive of that right is void as against public policy.

The only provision in the constitutions of the organizations here involved respecting the card-index-permit-system is found in article xiii, section 1, of the constitution of the district council, which provides as follows:

"All Local Unions affiliated with the District Council of New Jersey and New York west of the Hudson River, shall strictly adhere to Card Index System in respect to the employment of Local's membership."

Nowhere in the constitution of the international or the local is found any reference whatever to this system; nor are there any rules for its operation to be found anywhere, and the constitution and by-laws of the district council contain no provision for its alteration or abolition. Officials of the local and the international testified, however, that the system can be abolished only by a majority vote of the four locals composing the district council. This council is com-

posed of Local No. 11, of Newark; Local No. 45, of Jersey City; Local No. 373, of Perth Amboy, and Stone Derrickmen's Local No. 391, of Jersey City. But the officials of both local and international have already refused to recognize the vote of Local No. 11 to abolish the system. Local No. 373, of Perth Amboy, also voted to abolish. The international refused to recognize this vote and suspended its meetings. Local No. 45, of Jersey City, is the dominant local in the district council, is ruled by an arbitrary and iron hand, and no attempt, so far as the court is informed, has been made in that local to vote on the question. The remaining local is apparently not interested; it is a local of an allied trade, and is apparently not concerned in the matter one way or the other. It is clear that a perfect impasse exists on the question of the abolition of the system. Under these circumstances, the complainants invoke their inherent constitutional rights as citizens of this state.

On the question of the legality of this contract, via the union, restrictive of complainant's right to work, the following authorities, among others, may be considered: *Brennan* v. *United Hatters of North America, &c., 73 N. J. Law 729; Lehigh Structural Steel Co.* v. *Atlantic Smelting and Refining Works, 92 N. J. Eq. 131; Conners* v. *Connolly, 86 Conn. 641; Curran* v. *Galen, 152 N. Y. 33; Berry* v. *Donovan, 188 Mass. 353; Brooks* v. *Cooper* (*Court of Errors and Appeals, 1893*), *50 N. J. Eq. 761; O'Brien* v. *Musical Mutual P. & B. Union, supra; Brown* v. *Supreme Court, Independent Order of Foresters, supra; Erdman* v. *Mitchell, 207 Pa. 79; 56 Atl. Rep. 327; Jersey City Printing Co.* v. *Cassidy, 63 N. J. Eq. 759; Hitchman Coal & Coke Co.* v. *Mitchell, 202 Fed. Rep. 512; affirmed, 245 U. S. 229; 6 R. C. L. 707.*

Article I, paragraph 1, of the constitution of this state provides that—

"All men are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and of pursuing and obtaining safety and happiness."

Those unalienable rights being guaranteed by the constitution, any contract, unreasonably restrictive thereof, is necessarily void. I do not suggest that every contract restrictive of constitutional rights is void. Mutual advantages arising from such contracts equal to the burdens assumed or privileges curtailed may justify an individual in waiving constitutional rights. But those rights which the constitution recognizes as unalienable will be preserved by the courts notwithstanding individual contracts of waiver especially where the public interest is affected because that interest transcends the will or whim of the individual. This concern as to the public interest is what is known as "public policy." The contracts of individuals containing restrictions upon unalienable rights which are of an oppressive nature, and operating generally in the community to prevent workmen from obtaining employment and from earning their livelihood will not, therefore, be countenanced.

In *Brennan* v. *United Hatters of North America, &c., supra,* Mr. Justice Pitney, speaking for the court of errors and appeals (at *p. 742*), said:

"The common law has long recognized, as a part of the boasted liberty of the citizen the right of every man to freely engage in such lawful business or occupation as he himself may choose, free from hindrance or obstruction by his fellow men, saving such as may result from the exercise of equal or superior rights on their part—such, for instance, as the right of fair competition in the like field of human effort—and saving, of course, such other hindrance or obstruction as may be legally excused or justified."

And after reciting the provisions of the first section of our constitution above quoted, he continued:

"Our court of chancery * * * has affirmed the right of the citizen to conduct his business free from malicious interference, including his right to have free opportunity to hire employes. *And we may remark that the right of one seeking employment to have free opportunity to gain employment, and to retain a position of employment once it is gained, is as precious in the eye of the law as the right of the employer.*" (Italics mine.)

In *Conners* v. *Connolly, supra,* Chief-Justice Prentice, of the Connecticut supreme court, said:

"There is no more sacred right of citizenship then the right to pursue unmolested a lawful employment in a lawful manner. It is nothing more nor less than the sacred right of labor."

(Quoted with approval by Vice-Chancellor Backes in *Lehigh Structural Steel Co.* v. *Atlantic Smelting and Refining Works, supra.*)

In *Curran* v. *Galen, supra,* the court said:

"Public policy and the interests of society favor the utmost freedom in the citizen to pursue his lawful trade or calling, and if the purpose of an organization or combination of working men be to hamper, or to restrict that freedom, * * * then that purpose seems clearly unlawful, and militates against the spirit of our government and the nature of our institutions. The effectuation of such a purpose would conflict with that principle of public policy which prohibits monopolies and exclusive privileges. It would tend to deprive the public of the services of men in useful employments and capacities."

In *Berry* v. *Donovan, supra,* it was held that any contract or combination having for its object a monopoly or the control of anything which the world must have was void and unenforceable.

In *Lehigh Structural Steel Co.* v. *Atlantic Smelting and Refining Works, supra,* Vice-Chancellor Backes held that a contract between an association representing the majority of the building contractors in New York City and Long Island and an association representing labor unions in those communities binding the contractors to employ only union labor and having for its object the closed shop and the monopolization of the labor market by the union, violates public policy. There an express contract, voluntarily entered into, was involved. Here there is no express written contract to establish a monopoly of labor, but the testimony shows that there is an understanding between Local No. 11 and other unions forming the district council and many of the contractors in

this community, borne of fear on the part of the contractors, which has for its avowed object, so far as the unions are concerned, the monopolizing of the labor market in the building and construction trades. The testimony of many contractors shows that the arrangement has not been voluntary on their part, but that they have acquiesced in the arrangement through necessity. Many of these contractors testified reluctantly. They could not get men except from the unions, as they had agreed under pressure to employ only union men; but under the card-index-permit-system they had to take the men the union leaders sent them, fit or unfit, or their jobs would be tied up. Experience had taught them the danger attendant upon crossing the will of the labor leader. They adopted the policy of submission, swallowed their pride and pocketed their losses resulting from the compulsory hiring of inferior or incapable men. To recoup losses and to guard against new losses, contract prices on succeeding jobs had to be increased, and in the end the public paid the bill. I think it cannot be denied that construction costs on practically all major operations in the building trades, and on general construction work, in northern New Jersey, have increased in the past decade beyond all reason as a direct result of the unlawful conspiracies and racketeering methods of unscrupulous labor leaders. The defendant O'Neill testified that the purpose of the card-index-permit-system was to prevent non-resident iron workers from obtaining employment in New Jersey and that one of the benefits was that it enabled men "to loaf on the job." The audacity of such an admission is beyond comprehension. There is ample evidence that this condition has been reflected in increased costs of public works at the ultimate expense of the already overburdened taxpayer. That the public should be obliged to sit supinely by and submit to this indirect extortion is unthinkable.

If a voluntary contract entered into to effect a monopoly is against public policy and void, how much more so is such a contract which is the result of practical coercion? This arrangement between the unions and the contractors must

be considered in connection which the member's contract under which the defendants claim he is obliged to work pursuant to the card-index-permit-system. In combination, it would seem difficult to devise a more effective plan to coerce contractors to submit to the will of the unions and create a monopoly of the labor market in the building trades. The card-index-permit-system is one of the means used by the unions in enforcing their demands upon the contractors, the contract of which it is an incident tends toward monopoly, and is an unlawful interference with the free flow of labor to the employer. To the extent that the use of this system interferes with such free flow of labor to contractors it is entirely illegal. The legality of the members' contract as regards the resultant restriction upon their right to work and earn a livelihood depends largely upon whether or not the workman can, via the union rules, by contract deprive himself of his constitutional guarantees.

In *Plant* v. *Woods, 176 Mass. 492; 57 N. E. Rep. 1011,* the court said:

"The right involved is the right to dispose of one's labor with full freedom. This is a legal right, and it is entitled to legal protection. Sir William Erle in his book on trade unions, at page 12, has stated this in the following language, which has been several times quoted with approval by judges in England: 'Every person has a right, under the law, as between himself and his fellow subjects, to full freedom in disposing of his own labor or his own capital according to his own will. It follows that every other person is subject to the correlative duty arising therefrom, and is prohibited from any obstruction to the fullest exercise of this right which can be made compatible with the exercise of similar rights by others' * * *. As stated by Lord Bramwell in *Reg.* v. *Druitt, 10 Cox Cr. Cas. 592:* 'No right of property or capital is so sacred or carefully guarded by the law of the land as that of personal liberty. That liberty is not liberty of the mind only; it is also a liberty of the mind and will; and the liberty of a man's mind and will to say how he should bestow himself, his means, his talent, and his industry, is

as much a subject of the law's protection as that of his body.' "
See, also, *Barr* v. *Essex Trades Council, 53 N. J. Eq. 101* (at *p. 113*).

In *Erdman* v. *Mitchell, supra,* the supreme court of Pennsylvania said:

"The right to the free use of his hands is the workman's property, as much as a rich man's right to the undisturbed income from his factory, his houses and lands. * * * To exercise it, he must have the unrestricted privilege of working for such employer as he chooses, at such wages as he chooses to accept. This is one of the rights guaranteed him by our declaration of rights. It is a right of which the legislature cannot deprive him, one which the law of no trade union can take from him, and one which it is the bounden duty of the court to protect."

The constitution of the State of Pennsylvania guarantees the natural and unalienable rights of its citizens no more jealously than does that of New Jersey.

In *Jersey City Printing Co.* v. *Cassidy, supra,* Vice-Chancellor Stevenson, in speaking of the rights of employer and employe in a contract for services, said:

"The underlying right * * * * appears to be the right to enjoy a certain free and natural condition of the labor market * * * referred to * * * by Lord Ellenborough * * * as a 'probable expectancy.' This underlying right has otherwise been broadly defined or described as the right which every man has to earn his living, or to pursue his trade or business, without undue interference and might be described as the right which every man has, whether employer or employe, of absolute freedom to employ or to be employed. The peculiar element of this perhaps newly recognized right is that it is an interest which one man has in the freedom of another."

In *Hitchman Coal and Coke Co.* v. *Mitchell, supra,* it was held that "in their relation to their respective members, labor unions cannot undertake to require, by oath, obligation, constitution, by-laws or rule, a surrender by such members of their individual freedom of action, and when they seek to

do so, they become illegal combinations in restraint of trade." And the court said (at *p. 529*) :

"The inherent right of the individual laborer to sell his labor, which is his property, in any lawful manner or pursuit, and upon such terms and conditions as he may himself determine to be for his personal best interests must be upheld by the law just as fully and freely, regardless of these union organizations, as it is upheld in other relations of our civic life," and quoted from Sir William Erle on the Law of Trade Unions as follows :

"A person can neither alienate for a time his freedom to dispose of his own labor or his own capital according to his own will, nor alienate such freedom generally and make himself a slave. It follows that he cannot transfer it to the governing body of a union."

The text in *6 R. C. L. 707 tit. "Contracts"* § *114*, is as follows :

"The common law will not permit individuals to obligate themselves by a contract either to do anything which, or not to do anything the omission of which is in any degree clearly injurious to the public. * * * If a contract is of such a nature that it cannot be carried into execution without reaching beyond the parties and exercising an injurious influence over the community at large, every one has an interest in its suppression, and from a due regard to the public welfare, it will be declared void. The question whether a contract is against public policy must be determined by its purpose and. tendency, and not by the fact that no harm in fact results from it. Contracts which are void at common law because they are against public policy, like contracts which are prohibited by statute, are illegal as well as void, and will not be enforced."

In *Brooks* v. *Cooper, supra,* the court of errors and appeals held that where "a contract is of such a nature that it cannot be carried into execution without reaching beyond the parties and exercising an injurious influence over the community at large, everyone has an interest in its suppression and it will be pronounced void from a due regard to the public welfare."

It was also there held that any contract which "tends to injustice or oppression, restraint of liberty, restraint of legal

right * * * is against public policy and therefore void and not susceptible of enforcement," and that included in that class of contracts are those tending to prevent competition. It is clear that the card-index-permit-system tends to stifle competition within the ranks of the union at least. That it does not affect non-union men is immaterial as the union has a virtual monopoly of a particular kind of labor in the community over which it has jurisdiction and is exerting every effort to control such labor as is now without the pale. The allied unions here involved are engaged in a relentless campaign to enforce the closed shop upon all the structural and building works in the state and particularly in northern New Jersey. If the defendants' answer is to be considered as an attempt to enforce the complainants' contract, via the union, to abide by the card-index-permit-system, restricting their freedom of seeking employment, it is plain that under the authority of *Brooks* v. *Cooper* the contract should be declared void. It is true that ordinarily courts will neither enforce nor relieve parties from an illegal contract. The parties are usually left in the position in which they have placed themselves. It was on this ground that Vice-Chancellor Stevens, in *Attorney-General* v. *Firemen's Insurance Co., 74 N. J. Eq. 372,* based his decree dismissing the bill of complaint. But the court of errors and appeals held that if the acts complained of "tend to the public injury" they should be restrained regardless as "to whether or not possible injury had in fact resulted," and reversed the decree of this court. Whether or not, therefore, an actual monopoly in labor exists at the present time and is controlled by these allied unions is beside the mark. If the object of the organization, although undeclared, is the monopoly of a particular class of labor, it is not necessary for this court to await its accomplishment before affording relief. Equity acts to prevent impending injury as well as to relieve from injury presently being inflicted, rather than to redress a wrong completed and for which damages might lie.

It may, however, be claimed that the public has no interest

in the present controversy and that even if it had it would afford no ground for affirmative relief because the attorney-general is not a party to the proceeding. The public interest referred to in the *Firemen's Insurance Company Case* as respects the instant controversy lies in the fact that labor is a necessary commodity in all material progress and in the advancement of civilization. Any combination which seeks to control the supply of that labor, even though only in a certain class of work such as the building trades, is a monopoly in the making, is in restraint of trade and void. *Lehigh Structural Steel Co.* v. *Atlantic Smelting and Refining Works, supra; Curran* v. *Galen, supra; Berry* v. *Donovan, supra; Conners* v. *Connolly, supra; Brooks* v. *Cooper, supra.* In *Munn* v. *Illinois, 94 U. S. 113; 94 L. Ed. 77,* contracts between individuals respecting the warehousing of grain were involved. It was there considered that the interest of the public in that business was sufficient to warrant the court to act to protect the public welfare. The public interest in the business of warehousing of grain is certainly no greater than that in labor as a commodity. And in *Attorney-General* v. *Firemen's Insurance Co., supra* (at *p. 389*), the court of errors and appeals quoted Judge Story as follows:

"In cases where the agreements or other transactions are repudiated on account of their being against public policy, the circumstance that the relief is asked by a party who is *particeps criminis* is not in equity material. The reason is, that the public interest requires that relief should be given; and it is given to the public through the party. *1 Story Eq. 298.*"

In *Cone* v. *Russell & Mason, 48 N. J. Eq. 208* (at *p. 216*), Vice-Chancellor Pitney said:

"But it is urged in answer to both these positions that the complainants have no standing in this court because they stand *in pari delicto* with the defendants. There are two answers to this argument. In the first place the complainants are not asking for any affirmative relief by way of advantage from the contract. They are not asking to enforce

it and reap its fruits. On the contrary, they are asking to be relieved from its apparent obligations and to prevent any mischief which may be done under it. * * * In short, to aid them to undo, as far as possible, the wrong they have done. It seems to me this court ought not to turn its face from and shut its door against such suitors.

"But a second and complete answer is that the maxim *in pari delicto, potior est conditio defendentis,* does not apply to a case like this, resting upon the ground of public policy. *1 Story Eq. Jur. 298,* and cases there cited." See, also, *1 Pom. Eq. Jur. 403.*

In *O'Brien* v. *Musical Mutual P. & B. Union, supra,* Vice-Chancellor Emery held that this court would not enforce, *either directly or indirectly,* agreements as to exclusive juris-diction and rights of membership of a voluntary association which are intended to impose restrictive conditions on the individual right of contract and on conduct of a trade, and to secure, within a certain district, the monopoly of a par-ticular kind of labor because such restrictive regulations con-stitute an unjustifiable interference with the freedom of contract and of trade.

If the defense set up is an attempt to enforce the contract between the complainants and the labor union, as I think it is, to sustain the defense would be to indirectly enforce a contract, obviously restrictive of the complainants' constitu-tional right to work and which tends toward monopoly, and this it will not do, either directly or indirectly.

In *Brown* v. *Supreme Court, Independent Order of Foresters, supra,* the New York court of appeals said: "Par-ties cannot make a binding contract in violation of law or public policy."

The avowed purpose of Local No. 11 and allied locals is to unionize all work in the building trades. The international is acting in co-operation with the locals. A part of the ma-chinery used to accomplish the desired end is the permit system. Under the member's contract, the defendants say, they are obliged to work according to that system. The four allied unions cannot abolish it except by a majority vote of

three of the four and because of the dominating influence of certain labor leaders this seems to be an impossibility. If the complainants' contract with the union goes to the extent claimed by the defendant then I have no hesitation in saying that it is violative of the complainants' constitutional rights, is against public policy, and void. By it, if the defendants' contention is correct, the complainants would have surrendered to the union rights which the constitution declares are "unalienable." A member would have transferred to the union, and thus to its despotic rulers, his inherent "freedom to dispose of his own labor  *  *  *  according to his own will" and this Sir William Erle, and other eminent authorities, have said cannot be done. But worse—this transfer of individual will to the union is apparently beyond recall. The members cannot even assemble to discuss their grievances. A more perfect system of peonage could scarcely be devised. Even the will of the individual is in subjugation. And "the liberty of a man's mind and will  *  *  *  is as much a subject of the law's protection as that of his body." The unalienability of this liberty is guaranteed by the constitution, not alone for the benefit of the individual citizen, but for the good of the public at large as well. "It is an interest which one man has in the freedom of another." *Jersey City Printing Co.* v. *Cassidy, supra.* It is "a right which, in its very nature, cannot be surrendered to government or society, because no equivalent can be received for it, and one which neither the government nor society can take away. *39 Cyc. 665; Hale* v. *Everett, 53 N. H. 9, 60; 16 Am. Rep. 82.*

The testimony of O'Neill shows conclusively that the object of concerted action by the locals forming the district council is to enforce the principle of the closed shop in the building trades in northern New Jersey; but "the principle of the closed shop  *  *.  *  *i. e.,* the monopolization of the labor market, has found no judicial sponsor." *Lehigh Structural Steel Co.* v. *Atlantic Smelting and Refining Works, supra.* In that case Vice-Chancellor Backes quotes from *Conners* v. *Connolly, supra,* as follows:

"Monopolies of things of common use and need, * * * are odious, and their existence is contrary to the public policy. * * * They are especially intolerable where they concern the basic resource of individual existence, to wit, the capacity to labor. The whole theory of free government is opposed to them. Their beneficiaries may enjoy the favors they bestow and feel injured when deprived of them. But the interest of the public outweighs that of individuals, and the public at large can see nothing but danger in the monopoly of anything of which there is a common need, or which is a common resource of life."

I have been referred to but one case in which the card-index-permit-system or a similar system was involved. That is *Ryan* v. *Hayes, 243 Mass. 168; 137 N. E. Rep. 344.* The report of that case does not indicate exactly what the system was except that it is referred to as a "rotation system" where members of the union were placed upon a list and given work in rotation. It is apparently similar to the card-index-permit-system here involved but the question of its legality or unreasonableness was apparently not raised and was not commented upon by the court, nor did it appear that there was any monopoly or attempted monopoly of the particular branch of labor there involved. Nor was it used as a part of a general scheme of coercion of employers of labor, as here. On the contrary, the court found there was no conspiracy, no strike had been threatened, nor any intimidation practiced. There is nothing in the court's opinion suggestive of the provisions of the constitution and by-laws of the union so that the member's contract cannot be defined. Since nothing was said on the point it must be assumed that it was not repugnant to the Massachusetts constitution. Nor do I say here that the card-index-permit-system standing alone, divorced from the requirement of a permit, would be illegal. An agreement among a body of workmen equitably to divide among themselves the opportunities of employment might very well be of such mutual benefit and advantage as to be justifiable so long as it was not irrevocable and did not interfere with the equal rights of employers and others. The

256

iniquity of the card-index-permit-system here is that it is an important cog in the wheel which presses the upper upon the nether millstone and without which the grinding oppression complained of might not be accomplished. It cannot be divorced from the member's contract as a whole and it thus becomes as foul as that of which it forms a part. But there is a higher law than the law of the unions. "Such associations are not above the law nor altogether a law unto themselves. * * * The requirements of good government will not permit them [members] to be arbitrarily deprived by their leaders of their opportunity to work and earn." *Bricklayers,' &c., Union* v. *Bowen, 183 N. Y. Supp. 855; affirmed, 189 N. Y. Supp. 938.* Under the rules of the international and local a refusal of the complainants to work under the card-index-permit-system is sufficient cause for expulsion. Such a result would mean that these complainants would be deprived of the means of earning a livelihood at their trade in this community. Their contract via the union being void the union should be restrained from suspending or expelling them, or otherwise depriving them of any of the rights of membership, because of their failure or refusal to work through that system.

I will advise a decree in accordance with these conclusions.