This is a labor case. The basic question for decision on the facts of this case is whether the decree dismissing the employees' bill was, as urged, improper.
Appellants, complainants below, shall hereafter be referred to as employees, respondent Manhattan Laundries, Inc., as Laundry, and Local No. 617, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, and the individual named defendants, officers of the union, defendants below, as Union.
Generally stated, the employees by their bill sought to have their suspension from the Union "declared null and void and of no effect," to compel the Union "to restore and reinstate them to full membership in the Union," to "reinstate" them to the "seniority list" in the places to which they were entitled at the time when their employer dismissed them, to enjoin the Union and their employer from "violating" the terms of their "agreement" of employment, and to account for their financial "losses or damages" by reason of the alleged unlawful acts on the part of their employer and the Union.
The gravamen of the alleged unlawful acts is conspiracy. It finds specific expression in the fifteenth paragraph of the first cause of action of the bill, and reads as follows:
"* * * the Laundry, by its officers, agents and servants, together with the Union, by its officers and agents, met and without just cause or legal warrant or authority, confederated, agreed and conspired with each other, that the Union would bring charges against all the complainants herein in order to deprive them of their membership in the Union and thereby *Page 568 
deprive them of their employment by the Laundry in order to substitute others in their positions who would agree to the modification of the agreement as proposed by the Laundry."
The Union and the Laundry denied any wrongdoing and set up the separate defense that the employees failed first to exhaust the remedies provided within the Union.
The proofs in support of the bill disclose substantially the following facts:
The employees were and have been members of the Union for many years. They were five of the sixteen or seventeen drivers and helpers who worked for the Laundry pursuant to the last agreement (November 1st, 1941) between the Laundry and the Union. This agreement was "similar" to the prior agreements for six or seven years between the Laundry and the Union, and it provided, so far as is here pertinent, that the Laundry was to employ members of the Union with "paid up books," that differences should be submitted to a board of arbitration, that seniority rights of the employees be recognized, and that there should be a single night run. Under this agreement, eight trucks were in operation, seven were operated in the day time and one at night.
In April of 1942, Mr. Joseph B. Eastman, Federal Director of Defense Transportation, issued an order ("General Order O.D.T. No. 6") to carriers, operating motor vehicles. The purposes of that order were "to conserve vital equipment, materials and supplies including rubber." The attainment of these purposes was declared to be essential "to the successful prosecution of the war." By this order it clearly became obligatory on the part of the Laundry, as of June 1st, 1942, "to reduce the total monthly vehicle mileage of [its] rubber tired vehicles in a minimum amount equal to 25% of the total mileage of [its] vehicles in operation during the same calendar month of the year 1941 * * *."
Additionally, in May of 1942, Mr. Eastman addressed a letter to employers and employees of the motor vehicle industry emphasizing the need of achieving the purposes of his orders (including General Order No. 6, supra), and urged, inter alia, that "necessary adjustments" be made in a "spirit of full co-operation" by employer and employee even if his *Page 569 
orders "may entail some dislocation of employment" and "in some instances may require modification or revision of existing labor agreements."
And in May of 1942, the general president of the parent Union addressed a communication to all officers of local Unions in which he explained the relationship between labor and the government. He, too, urged labor to support the government and especially urged that employees, in their effort to better their economic status, should reach an agreement with their employers through "mutual understanding." Said he further: "But if you fail, you can not go on strike. You must offer arbitration and I have been advised that if arbitration is refused you must not even then bring about any stoppage of work that will inconvenience the government or the public."
In this posture of affairs, officials of the Laundry and the Union conferred to the end of working out a compliance of General Order O.D.T. No. 6 with least dislocation or disadvantage to all concerned. A change in the delivery system of the Laundry was inescapable. As a result of these conferences it was agreed that the Laundry would entirely eliminate one truck from day work and add another truck for night work. Thus instead of operating seven trucks in the day time and one truck at night, five trucks would be operated in the day time and two trucks at night. The plan wrought no change in the number of employees, no change in their seniority rights, and no change in their salaries. It did contemplate a rotation in the operation of the trucks so that each employee would be required only to work one night "about every seven weeks." The executive board of the Union approved the plan. As so approved it was submitted to the employees. They refused to accept it. They accused their Union officials of being "double crossers," of "selling them out," and were otherwise abusive of them. They were adamant in their position. They insisted that the letter of the contract be observed, namely, that one truck only be operated during the night time. Otherwise, they "threatened to strike" and "not work." They refused the offer to arbitrate the matter. *Page 570 
Charges were preferred by the Union against the employees and two others. These charges are of rather doubtful sufficiency. They purport to charge, in most general terms, that the employees refused to operate trucks in accordance with the stated plan, refused to listen to the report of the committee, and refused to arbitrate their differences; and the employees were in like general terms charged with abusive, profane and threatening language to the officers of the Union and with being in arrears with their dues.
Hearing on the charges was held by the executive board of the Union on July 17th, 1942. Three of the five employees failed to appear; Neal appeared and denied the charges. Although the registered letter containing the charges against Weaver was returned marked "unclaimed," Weaver was present at the hearing. When asked why the registered letter was not received by him, he just "laughed." He asked for no adjournment. He heard the charges and the proofs, but interposed no defense. The only statement he made as to the trial was "Well, let's get going. Let us get it over with." The employees were found guilty and were suspended on July 20th, 1942, from the Union. On July 21st, 1942, the Laundry was notified to dismiss them in accordance with section 3 of the contract (November 1st, 1941) between the Laundry and the Union. Accordingly, the Laundry dismissed them. And concededly without having first exhausted the remedies within the parent Union (Article XVIII, section 13 of its constitution) the employees filed the bill in this cause on August 3d 1942.
1. The learned Vice-Chancellor based his dismissal of the bill as to the Laundry on the ground that there was no proof of the charge that a conspiracy existed between the Laundry and the Union "to deprive" the employees of their "membership in the Union," and of their "right to continue in their employment." We concur. We pause only to add that not only is there no proof in support of the charge but rather do the proofs clearly and persuasively establish that both the Laundry and the Union in this case fully co-operated to the end of helping attain the purposes which the federal government sought to attain by its "General Order O.D.T. No. 6." *Page 571 
And they did so with no injury, with no dislocation and with no substantial inconvenience to all those affected.
2. The learned Vice-Chancellor based his dismissal of the bill as to the employees on the ground that they failed first to exhaust their remedies as prescribed by the constitution of their parent body, article XVIII, section 13, and since the employees failed to show that they were "relieved of that requirement," or that the "remedy was inadequate," or would have been "futile, illusory [delusory] or vain," Walsche v. Sherlock, 110 N.J. Eq. 223; 159 Atl. Rep. 661 (Cf. also Local No. 373, c., v.International, c., Ironworkers, 120 N.J. Eq. 220, 230;184 Atl. Rep. 531; Buddle v. Reliable Council No. 169, Jr. O.U.A.M.,129 N.J. Law 392, 396, 397; 29 Atl. Rep. 2d 869), hence the Court of Chancery lacked jurisdiction to determine the controversy between the complaining members and their Union.
We think that whenever the stated principle (failure first to exhaust remedies within the body) is applicable that perhaps it is more accurate to say that the jurisdiction of Chancery is not properly invoked, or brought into play, rather than to say that Chancery lacks jurisdiction. For the employees' trade and membership in their Union with its resultant benefits, are property rights which our courts are obliged to and do shield and protect. LoBianco v. Cushing, 117 N.J. Eq. 593;177 Atl. Rep. 102; affirmed, 119 N.J. Eq. 377; 182 Atl. Rep. 874. But "even where property rights are involved, there will be no judicial interposition until the remedy within the body has been exhausted, if it is adequate and the members have so stipulated."Mogelever v. Newark Newspaper Guild, 124 N.J. Eq. 60, 61;199 Atl. Rep. 56.
By the constitution of the parent body, the employees are given fifteen days from "the date of the rendition of the decision" by the local executive board to appeal to the general executive board of the parent body, located at Indianapolis, Indiana. Article XVIII, section 2 (a). True, the notice of appeal need not be formal but it is equally true that it must be informative and that pending the appeal, the decision appealed from "remains in full force and effect." The date for the hearing of the appeal may be fixed by the *Page 572 
general executive board and the decision thereon is required to be made as promptly as possible — without unnecessary delay. And appeals from that body shall be taken to the next convention. Article XVIII, section 2 (b). There is nothing to indicate when or where the next convention may be held.
We find it unnecessary to determine whether the time limitation (15 days) for the taking of the appeal and the remedy itself (not operating as a stay) were under the circumstances adequate even though the employees may, under the constitution, be bound by them. For the employees assert that they received no copy of the constitution and by-laws from the Union and hence were ignorant of their provisions concerning appeals. There is no proof to indicate that a copy of the constitution and by-laws were in fact given to them. Nor is there proof to indicate that they had any need therefor until after their suspension from the Union. It will be recalled that they were tried on July 17th, 1942, the secretary mailed notice of their suspension on July 20th, 1942, and they were dismissed by the Laundry on July 22d 1942. On the very day of their dismissal, their attorney, by letter addressed to the secretary of the Union, requested a copy of the constitution and by-laws of the Union but that request was refused. The secretary told the attorney that "any business we have to do would have to be referred to our lawyer." The employees could not do the impossible. They surely could not be expected to know the technical provisions of the constitution and by-laws for the taking of an appeal without a copy thereof having been made available to them. It is not a good answer to say that their attorney, and not the employees, was denied the request. There was no justification for that denial. It left the attorney in the position where he was obliged to, as he did, seek the aid of Chancery to shield and protect the employees' property rights. The time for appeal within the parent body has long since expired. And without membership in the Union the employees' opportunity to obtain a job at their trade is, to say the least, seriously affected because the area in which they work is strongly unionized.
In fine, we hold that, under the particular circumstances *Page 573 
of this case, the employees are entitled to a hearing on the merits of their suspension from the Union.
The decree as to the Laundry is affirmed, with costs; as to the other parties, the cause is remanded to the court below there to be treated consistently with this opinion. Costs are to abide the event.
For modification — THE CHIEF-JUSTICE, PARKER, CASE, BODINE, DONGES, HEHER, PERSKIE, PORTER, COLIE, DEAR, WELLS, RAFFERTY, HAGUE, THOMPSON, DILL, JJ. 15. *Page 574