AUDITORIUM KENNEL CLUB, A CORPORATION, PLAINTIFF, v. CITY OF ATLANTIC CITY, A MUNICIPAL CORPORATION, DEFENDANT.

Decided June 13, 1938.

For the plaintiff, *Joseph A. Corio* (*H. Walter Gill,* of counsel).

For the defendant, *Siracusa & Backer* (*Clarence L. Cole,* of counsel).

JAYNE, S. C. C.   The defendant, by means of this motion, prays the allowance of a rule striking out the complaint. The specified reason underlying the motion is that the alleged cause of action is not legally maintainable.

Succinctly stated, the complaint alleges that on February 27th, 1935, the parties, as a result of mutual agreement, duly executed a written lease whereby the city granted and demised to the plaintiff the main hall including the stage and balconies in the Convention Hall situate beside the boardwalk at Atlantic City from June 28th, 1935, to September 9th, 1935, at a total rent of $165,000, the premises to be used and occupied by the plaintiff solely for the purpose of there racing dogs under the pari-mutuel system of wagering. The initial installment of rent in the amount of $25,000 was paid by the plaintiff to the defendant on March 1st, 1935, in compliance

with the terms of the lease. Additionally, it is declared in the complaint that the plaintiff never entered into actual possession of the demised premises and that on June 14th, 1935, the plaintiff abandoned the avowed object of the lease and demanded of the defendant the return of the $25,000. The lease is attached to and expressly made a part of the complaint. Hence this action is being prosecuted in the effort to recover from the defendant the sum of $25,000 previously paid to the defendant by the plaintiff in performance of the covenant of the lease.

In approaching the consideration of the controversial points debated by counsel, it is well to recollect that in the suit in Chancery between State Racing Commission and Atlantic Kennel Club, it was adjudged in September, 1934, that chapter 391 of the session laws of 1933 and chapters 56 and 179 of the session laws of 1934 were in defiance of the state constitution. The case of *Gimbel* v. *Peabody*, 114 *N. J. L.* 574; 178 *Atl. Rep.* 62, in which it was concluded by the Supreme Court that chapters 56 and 179 of the laws of 1934 were unconstitutional, was argued on January 17th, 1935, and the decision rendered on April 8th, 1935. On February 13th, 1935, the case of *Hyman* v. *Long Branch Kennel Club, Inc.,* 115 *N. J. L.* 123; 179 *Atl. Rep.* 105, was argued before the Court of Errors and Appeals and in an opinion read on May 17th, 1935, it was concluded that all of these enactments were plainly unconstitutional and invalid. Significantly, the complaint in the present action embodies the following allegations: "When the lease aforesaid was executed both parties thereto understood and agreed that pari-mutuel betting provided for in the statutes aforesaid was the essential and necessary part of the leasehold contract without which privilege neither party would have entered into said lease." In *Streeper* v. *Auditorium Kennel Club* (the plaintiff in this action) reported in 13 *N. J. Mis. R.* 584; 180 *Atl. Rep.* 212, the proceedings authorizing and creating the lease mentioned in the present complaint were set aside. Mr. Justice Case, speaking for the Supreme Court,

observed, "the object of the lease agreement was palpably unlawful." An agreement which stipulates for iniquity in that it is against the indubitable policy and spirit of the fundamental law of the state, is assuredly an illegal contract. The object of the lease was, by its express terms, definitely restricted to an unlawful undertaking. The parties clearly infused into the lease elements which contaminate the entire agreement. A contract itself and its tendency are the tests of its illegality. The results which it may or may not have yet produced are not the proper tests. This lease could not have been enforced. The city could not have recovered from the lessee the installments of rent subsequently falling due even though the racing of dogs had not yet been actually undertaken.

In *Church* v. *Muir,* 33 *N. J. L.* 318, Chief Justice Beasley stated: "The general rule undoubtedly is, that courts will not assist a party either to execute or to undo an illegal transaction. If the forbidden agreement has been executed, the parties are left where they have placed themselves; if it remains executory, its performance cannot be legally compelled. The principle is embodied in the old common law maxim, *ex turpi causa non oritur actio.* The rule has a wide scope, for it takes away all legal help from all contracts, whether under seal or by parol, which stipulates for the performance of an immoral act, or any act contrary to the provisions of a legislative act, or to the public policy of the common law. It is not necessary to refer to adjudications in support of a principle so universally admitted."

Chancellor McGill, speaking for the Court of Errors and Appeals, in *Hope* v. *Linden Park Association,* 34 *Atl. Rep.* 1070; 58 *N. J. L.* (at *p.* 631), stated: "That rule is the application of the maxim *ex turpi causa non oritur actio.* The maxim has its foundation in the public policy of discouraging illegal and corrupt agreements, by holding them to be void and refusing all judicial aid between the parties to them."

"In *Den* v. *Shotwell,* 3 *Zab.* 465, 474, Chief Justice Green used this language: 'But in dealing with illegal contracts,

courts do not and cannot look to the interest of those who are parties to the illegal transaction. The law regards the welfare of society as paramount, and, in enforcing the law, courts cannot impair its efficiency or cripple its operation by considerations affecting the interest of those who are *particeps criminis.*'"

\*     \*     \*     \*     \*     \*     \*

" 'The principle of public policy is this—*ex dolo malo non oritur actio.* No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If from the plaintiff's own stating, or otherwise, the cause of action appears to arise *ex turpi causa,* or a transgression of a positive law of this country, there the court says he has no right to be assisted. It is upon that ground that the court goes, not for the sake of the defendant, but because they will not lend their aid to such a plaintiff, so if the plaintiff and defendant were to change sides, and the defendant were to bring his action against the plaintiff, the latter would then have the advantage of it; for where both are equally in fault, *potior est conditio defendentis.*'"

"In *Marlatt* v. *Warwick,* 4 *C. E. Gr.* 454, Mr. Justice Depue said: 'The objection is rather that of the public, speaking through the courts, than of the defendant as a party to the contract. The law disallows all proceedings in respect of illegal contracts, not from any consideration of the relative position and rights of the parties, but upon grounds of public policy.' "

The same rule has been observed and followed by our Court of Chancery. Cases may, of course, be found in which Chancery has acted but has done so to protect the public welfare and to prevent the impending mischief which would arise from the performance of the illegal contract. In such cases equity has acted because the public interest required the relief. An acquaintance with our reported decisions on this subject discloses a continued adherence by our courts to the principle embodied in the common law maxim. The principle is to be recognized and regarded as a general rule of

public policy. It is not difficult to discern in the decisions of our state a definite adoption of this policy and a disinclination to depart from it. In *Pennington* v. *Todd,* 47 *N. J. Eq.* 569 (at *p.* 572); 21 *Atl. Rep.* 297, Mr. Justice Dixon remarked: "An examination of the authorities will show that, while courts have uniformly admitted the impolicy of aiding plaintiffs in furtherance of their tainted schemes, yet they have not been unmindful of the added immorality of defendants in seeking to wrong plaintiffs also because of their own turpitude, and hence they have been sometimes perhaps too ready to perceive distinctions between the plaintiff's claim and his improper acts in which it originated, so that a base defense might be defeated. This tendency received some adverse criticism in the New Jersey decisions above mentioned, on the ground that courts ought to proclaim the outlawry of such affairs from the first step to the last, not for the sake of the defendant who would cheat his associate in guilt, but in order to render the transactions as precarious and difficult as possible to those who might be inclined to enter upon them. This, undoubtedly, is the ultimate reason on which courts act, when they refuse to aid plaintiffs engaged in forbidden or nefarious enterprises."

It is asserted on behalf of the plaintiff that the lease was entered into by the parties in good faith and without any intent to violate the law. This assertion cannot be rationally accepted. In *Gimbel* v. *Peabody, supra,* Mr. Justice Bodine said: "Those who can read can understand the constitutional provisions of this state \* \* \*." Moreover, an examination of the lease itself reveals that there was then in the minds of the parties the likelihood that the lessee might be prevented by law from conducting its proposed business in the demised premises. The parties to the lease were unquestionably *in pari delicto*.

Then, next, it is argumentatively proposed that the facts alleged in the complaint disclose that the illegal object of the lease remained entirely unperformed at the time the plaintiff abandoned it. Tersely stated, the plaintiff thus seeks to

invoke the so-called doctrine of *locus poenitentiæ* and maintain this action on the theory of *indebitatus assumpsit* for money had and received.

In some jurisdictions, courts have held, as a corollary to the general rule, that until the illegal purpose of the agreement has been executed, there is a *locus poenitentiæ* during which either party may repent, disaffirm the agreement and recover back money or property which he has advanced under it. In those jurisdictions, although the policy is different, the underlying purpose of the courts is the same. The purpose is to protect society from the influence of contracts made in disregard of the public weal by interrupting the progress of illegal undertakings before the evil object has been consummated and thus reduce the number of such transactions. Our courts have deemed it to be more protective of the public interest to proclaim the outlawry of such undertakings from the first executed step to the last. The following citations suffice to exemplify the trend of the pertinent decisions in our courts: *Van Doren* v. *Staats,* 3 *N. J. L.* 448; *Watson* v. *Murray,* 23 *N. J. Eq.* 257; *Reeves* v. *Butcher,* 31 *N. J. L.* 224; *Sulphin* v. *Crozer,* 32 *Id.* 462; *Church* v. *Muir,* 33 *Id.* 318; *Gregory* v. *Wilson,* 36 *Id.* 315; *Price* v. *Pollock,* 37 *Id.* 44; *Ellicott* v. *Chamberlin,* 38 *N. J. Eq.* 604; *Pennington* v. *Todd,* 47 *Id.* 569; 21 *Atl. Rep.* 297; *Cone* v. *Russell & Mason,* 48 *N. J. Eq.* 208; 21 *Atl. Rep.* 847; *Brooks* v. *Cooper,* 50 *N. J. Eq.* 761; 26 *Atl. Rep.* 978; *Gennert* v. *Wuestner,* 53 *N. J. Eq.* 302; 31 *Atl. Rep.* 609; *Hope* v. *Linden Park Blood-Horse Association,* 58 *N. J. L.* 627; 34 *Atl. Rep.* 1070; *Wyckoff* v. *Weaver,* 66 *N. J. L.* 648; 52 *Atl. Rep.* 356; *Somers* v. *Johnson,* 70 *N. J. L.* 695; 59 *Atl. Rep.* 224; *Allfather* v. *Schlicher,* 86 *N. J. Eq.* 1; 97 *Atl. Rep.* 491; *Walsche* v. *Sherlock,* 110 *N. J. Eq.* 223; 159 *Atl. Rep.* 661.

The so-called doctrine of *locus poenitentiæ* necessarily rests upon grounds of public policy in a case in which the factual situation warrants its adoption. It cannot be accommodated to the facts alleged in the complaint in the present

action. Here the acquisition of a suitable arena was an integrant and essential segment of the illegal enterprise. This part of the venture was not in an executory state. See *Ellicott* v. *Chamberlin, supra*. The contention of the plaintiff is erected upon the premise that everything in furtherance of the illegal object continued to be lawful until a race was actually conducted and a bet placed on the result of the event. Essentially the same point was considered by our courts with some diversity of opinion in *Huncke* v. *Francis,* 27 *N. J. L.* 55; *Sutphin* v. *Crozer (Supreme Court),* 30 *Id.* 257; *Sutphin* v. *Crozer (Court of Errors and Appeals),* 32 *Id.* 462. In *Huncke* v. *Francis, supra,* the contract under consideration was that the defendant would hold the stakes and pay them to the winner of the race. The Supreme Court concluded that until the money was paid over, the contract was not executed but remained executory and subject to rescission by the plaintiff who could, upon rescission, recover the money deposited with the defendant. Mr. Justices Elmer and Potts based their dissenting opinions upon the fact that the contract to hold the money was itself illegal. In *Sutphin* v. *Crozer,* 32 *N. J. L.* 462, Mr. Justice Elmer delivered the opinion of the Court of Errors and Appeals in which his earlier view of the problem was adopted. *Hensler* v. *Jennings,* 62 *Id.* 209; 41 *Atl. Rep.* 918; *Van Pelt* v. *Schauble,* 68 *N. J. L.* 638; 54 *Atl. Rep.* 437.

Suppose a lease of a property is consummated for the exclusive purpose of storing and concealing therein stolen goods. Does the legality of such a transaction depend upon the commission of the contemplated theft and the actual use of the property for the intended purpose? Should the lessee be clothed with the right to recover the rent paid by him to the lessor unless he succeeds in stealing the goods and storing them on the demised premises? Suppose the lessee tried to accomplish his criminal objective and was unsuccessful.

There is no moral efficacy in a policy that permits an adventurer to proceed with his unlawful undertaking until he discovers the utter futility of his efforts and when hopeless of

all gain, repents and with the aid of the courts is re-established *stalu quo ante contractum*. No court in any jurisdiction follows such a policy. There is naturally a type of *locus poenitentiæ* when the police arrive on the scene. When on June 14th, 1935, the plaintiff announced its abandonment of the illegal object of the lease, antecedent events, to which reference has been previously made, had already imbued the plaintiff with despair. A perusal of the communication dispatched by the plaintiff to the defendant on that date, a copy of which is made a part of the amended complaint, makes evident the plight of the plaintiff. A few quotations from the letter are illuminating:

"Since the making and execution of said Lease, and since the passage of said Law, the Supreme Court of the State of New Jersey, has declared said Law unconstitutional, and greyhound racing operated under the pari-mutuel system in New Jersey, as unlawful; and since also the execution of said Lease, and the passage of said law, the Court of Errors and Appeals of New Jersey, has also declared that greyhound racing operated under the pari-mutuel system, is also unconstitutional and unlawful, and has also declared chapter 56, of the Laws of 1934, as being unconstitutional; and also, since the making and execution of the Lease aforesaid, one Elizabeth Streeper has instituted proceedings in the Supreme Court of New Jersey, asking that said Lease made and executed between the City of Atlantic City, and the Auditorium Kennel Club, be set aside, and declared null and void, for the reasons as assigned in their action, and for the further reason, of the pronouncements by the Supreme Court, and by the Court of Errors and Appeals, of our State. This latter action is still pending, and the Supreme Court has not, until this date, rendered its opinion." "The officers of the Auditorium Kennel Club would like to perform the terms of their lease, that is, to have greyhound racing under the pari-mutuel system, in the Auditorium, in accordance with the term set forth in said lease * * *." "If the Auditorium Kennel Club was to take possession of the Auditorium, and

install therein a track for the purpose of greyhound racing, and also install pari-mutuel machines for the operation of said races, and would actually operate races under said system, and in accordance with the terms of the lease, they would be violating the law, and would be subject to indictment, and upon conviction, guilty of a misdemeanor, submitting themselves to a prison sentence, and also a fine, within the discretion of the presiding judge."

From all of which it is certain that for the plaintiff the view ahead had become obscured by visions of prosecutions, convictions and possible imprisonment. Wherefore the plaintiff became contrite.

The plaintiff was obviously *particeps criminis* and for its own private advantage it is not entitled under the authority of our adjudicated cases to the aid of the court in its effort to undo the illegal transaction into which it voluntarily entered. In the circumstances unveiled by the complaint, there are no considerations of public welfare to support the prosecution of this action.

In such a case where the facts are exposed by the complaint, the objection to the prosecution of the action may be properly taken by demurrer. *Hope* v. *Linden Park Association*, 58 *N. J. L.* (at *p.* 632); 34 *Atl. Rep.* 1070. A rule striking out the complaint may be presented.