These two cases involve the internal affairs of Local No. 244, International Alliance of Theatrical Stage Employes and Moving Picture Machine Operators of the United States and Canada. The relief sought in both suits being identical in some respects and similar in others, and both concerning malfeasance or misfeasance of the union officers and alleged unlawful discrimination between members of that union, the cases were consolidated for the purpose of trial, were heard together and will be disposed of as one case. The first named case is known as the "junior" case; the second, as the "senior" case. The complainants in the first case are all so-called "junior" members of the local and the complainants in the second case are all so-called "senior" members of the same local.
By the first bill, complaint is made and relief sought as follows: *Page 232 
1. Complaint of the alleged illegal and unauthorized classification of the members of the local into junior and senior classes. The complainants seek full membership rights in the union and an injunction against the continuance of this classification and consequent discrimination.
2. Complaint against so-called "arm-work" or "working on the arm." The relief sought under this heading is an injunction against the continuance of this practice and an accounting by the officers of all moneys received by them as the result of such "arm-work."
3. Complaint of extortion by the officers, individually, of moneys from the juniors as the price of certain moving picture operators' jobs and periodical payments to said officers by the juniors as the price of their continuance in those positions. An injunction against this practice and a discovery and accounting for all of such payments are sought.
4. Complaint against the control by the union through its officers, and particularly by the business agent, of the various moving picture machine operators' jobs within the jurisdiction of the local and consequent discrimination between and among the members, and interference with their right to freedom of contract of employment. An injunction against the continuance of this practice is sought.
5. Complaint of the alleged illegal and unauthorized disbursement of moneys of the local since January 1st, 1929. A discovery and an accounting for such moneys are sought.
6. Complaint of misfeasance or malfeasance with respect to group life insurance. Discovery as to such insurance is sought.
7. Complaint of misfeasance, malfeasance, extortion, discrimination and general mismanagement of the affairs of the local. The relief sought under this heading is the appointment of a custodial receiver and an injunction against the officers' continuance in office.
The charges of the "senior" bill and the relief sought are generally similar to those contained in the "junior" bill. In addition they charge:
8. That the officers of the union have, without warrant, preferred charges against them and threatened them with *Page 233 
suspension or expulsion from the local because of their activities in support of the junior suit and in demanding recognition of their own right of freedom of contract; and they seek an injunction against the preferring or hearing of any such charges against them and from suspending or expelling any of them pending the final disposition of this cause. They also ask a decree declaring void all provisions of the local constitution and by-laws which in any way interfere with the members' freedom of contract of employment.
The final hearing in these cases began April 23d 1934, and continued intermittently thereafter until June 27th, 1934, during which period many witnesses were examined and voluminous testimony was taken. Subsequently, on July 30th, 1934, the testimony of two witnesses, officers of the International Alliance of Theatrical Stage Employes and Moving Picture Machine Operators of the United States and Canada, was taken de beneesse in New York City, they having refused, for reasons best known to themselves, to submit to the jurisdiction of the court and testify in this state. At the conclusion of the final hearing in June counsel were directed to file briefs with the court. Complainant's brief was received on May 3d 1935, and that of defendants on June 20th, 1935. Had briefs been submitted immediately after final hearing, as directed, these cases could have been disposed of promptly. The delay, which has occasioned complaint on the part of some of the complainants, is due entirely to neglect of counsel. The effect of this delay upon other litigation pending before me cannot be accurately appraised, but it has proved a serious impediment to the prompt disposal of other causes of equal or greater importance.
I shall now consider the various complaints and the relief sought in their order as above stated.
 1. MEMBERSHIP RIGHTS
The defendant local was chartered by the defendant International on May 24th, 1912. Neither its constitution and *Page 234 
by-laws nor the constitution and by-laws of the International provide for any classification of its members as juniors and seniors; nor, in fact, is any distinction made in those documents as to members. As a matter of fact, the preambles to the constitution and by-laws of both International and Local breathe a spirit of complete equality and fraternity. Article a, section 19 of the by-laws of the International provides, however, that "affiliated locals are required to insist that all positions within their jurisdiction be filled by their own members. In the event of the local membership being unable to care for all vacancies, preference must be given to members of sister locals affiliated with this alliance. Not until the available members of resident and out-of-town locals have been employed shall the engagement of non-members be permitted. Any local failing to comply with the requirements of this section shall be fined not less than Fifty Dollars ($50.00) for each offense."
This provision was evaded by the officers of the local by attaching to the local from time to time a number of operators who were known as "permit men." This practice was the result of the desire on the part of the officers to employ local talent in local theatres, while at the same time restricting the membership of the union to that number deemed requisite to insure the officers complete cotnrol of the positions involved. The permit men had no membership cards, were not initiated, paid no regular dues and were not participants in or beneficiaries of the group insurance plan. Their only right was to take jobs under the supervision of the local. The number of permit men had increased to approximately fifty in 1918 when the defendant Kauffman became a member, and the regular membership of the union did not exceed sixty down to 1925. Members of other locals having complained of this apparent evasion of the quoted section of the by-laws of the International, the officers of the defendant local conceived the idea of admitting the permit men to limited membership in the local and thus instituted the junior and senior systems, in total disregard of the spirit of equality and fraternity suggested by the preambles to the constitutions and by-laws above referred to. In March, 1929, *Page 235 
fifteen of the permit men were admitted into the local as juniors. These men were not novices in the trade or apprentices in any sense of the word. They were moving picture machine operators of many years' experience. Additional men were admitted into the local as junior members until at the time of the final hearing there were eighty-six juniors and ninety-one seniors. The proceedings for admission of the juniors were exactly the same as those applying to the admission of seniors. They applied for membership on printed application blanks furnished by the International. These were sent to the general secretary-treasurer of the International and approved by him. The applicants were then initiated and took the "oath of allegiance to the union." The ceremonial formalities of their admission were exactly the same as those of the seniors. Union cards exactly like those held by the seniors were issued to the juniors by the International. These cards were sent by the International to the local union and after their receipt by the local and before delivery to the new members the words "Jr. Dept." were stamped upon the cards with a rubber stamp by the treasurer of the local. The juniors pay exactly the same dues to the International Alliance as the seniors. The group insurance policy taken out by the local covers the juniors as well as the seniors and all are classified as "members" and all members — juniors as well as seniors — hold like certificates of insurance in which each is designated as "member of local No. 244." As already stated, the by-laws authorize no classification of members into juniors and seniors nor is there otherwise any discrimination among members authorized by these documents. There are, however, certain unwritten laws or rules promulgated by the officers of the union, with the approval of a majority of the seniors, which deprive the juniors of any voice in the union's affairs. They are not permitted to attend or vote at meetings of the members and they are obliged to surrender their jobs to the seniors upon demand. Seniors are also entitled to preference in the allotment of jobs. The juniors are required to pay to the local ten per cent. of their weekly wages up to $50 and fifteen per cent. of their wages in excess of that amount. They also pay $9 *Page 236 
dues per quarter or $36 annually, while the seniors pay $45 per quarter or $180 per annum, but make no other contribution to the treasury of the local. Thus a junior receiving $100 per week would pay ten per cent. of $50 or $5, and fifteen per cent. of $50, or $7.50, a total of $12.50 per week or $650 per annum; and in addition $36 dues, making a total of $686 as against $180 for the seniors. Out of the quarterly dues paid by the members $3 from the seniors and $6 from the juniors is allotted by the local to the sick and insurance fund. There is no written contract between the juniors and the local which authorizes these exactions or the consequent discrimination between juniors and seniors. The authority of the officers to thus discriminate between the two classes of members rests upon motions or resolutions of the senior members recorded in the minutes of the local, or upon the will or whim of the officers themselves. Under the "rules" of the local a junior member cannot be advanced to the position of a senior member except by two-thirds vote of the seniors at any meeting called for that purpose. Before a junior is eligible to such advancement he must deposit with the treasurer the sum of $500 in cash as an admission fee. The opportunities for such advancement under the arbitrary rules of the local are slight, indeed. Only eleven men have been made seniors since 1929, seven of whom were closely related to officers of the local; and two others were closely related to high officials of the Newark police department. It is admitted that at least one of these latter was made a senior because of the influence of his father, who was, at the time, a high police official. At the time of his admission he had been affiliated with the local only six or eight months. Other juniors who have been such for years are still waiting.
It is also a rule of the local that when a senior relieves a junior temporarily, the senior is to be paid at the full senior rate of $13 per day, even though the particular job pays less, in which event the junior must make up the difference. The junior has no voice in fixing the scale of wages of either juniors or seniors.
It is contended by the defendants that the juniors are really apprentices, and so they are registered in the New York *Page 237 
office of the International Alliance; but the classification is determined by the local controlled by the seniors and the secretary of the local wrote the word "apprentice" in each junior application without the authority of the applicant. But, as already stated, none of the juniors is an apprentice in any sense of that term; all are experienced operators and hold positions equal in importance to any held by the seniors; and there is no provision in the international or local constitution or by-laws for the serving of any apprenticeship.
The instant case is not unlike Cameron v. InternationalAlliance of Theatrical Stage Employes and Moving PictureOperators, 118 N.J. Eq. 11, in which the court of errors and appeals condemned the junior and senior systems employed in the Hudson county local and accorded the juniors full membership rights in that local; in fact, the factual situation in both cases is almost identical except that in the Cameron Case there was a written contract between the local and the juniors, while here there is no such contract. The practice in the allotment of jobs is, however, the same. On the authority of that case, I therefore hold that the juniors are entitled to the full and complete membership rights in Local No. 244 equally with the seniors.
 2. ARM WORK
At the conclusion of the final hearing I said that this pernicious practice must cease. I believe it was enjoined by the preliminary restraining order. It will be enjoined by the final decree. "Arm work," or "working on the arm," as it is called, is where one member, usually a junior, performs the work of one of the officers as an operator in a moving picture theatre in addition to his own work in another theatre, and that officer collects the salary incident to the job he nominally holds, the member actually performing the work receiving nothing for it. In this way, Kauffman, the business agent, Cooper, the president, Oppenheimer, the secretary, and Gehring, the assistant business manager, and perhaps others, have *Page 238 
been on the payrolls of the largest theatres in Newark and vicinity for years, but actually did no work there. Those who did "arm work" insist they had to do it to hold their regular jobs. As a consequence, some of them worked sixteen or more hours a day while getting paid for only half or less of that time. The excuse (?) of the officers for this system of "arm work" is that their time is taken up with official business and the officers' salaries are small. Obviously, the juniors, or some of them, ought not to carry the burden of the support of the officers who supposedly act for the benefit of all of the members. If the duties of the respective offices call for full time, the incumbents should receive full time pay from the union treasury, and not from the individual juniors. But the evidence shows that some of the officers are already liberally compensated out of the union treasury. This system of "arm work" has been in vogue since before 1927. The defendant Kauffman has not worked at all since 1929; but he has been in receipt of a salary from one of the best paying jobs in Essex county and one of the juniors has performed his work for nothing. One witness calculated that he had earned more than $30,000 by "arm work" for which the officers received the pay; another, $25,000; and others, lesser sums. The bare fact that the system of "working on the arm" exists (and it is admitted) is an indication of the principles and moral caliber (or lack of them), of the officers who have profited by it; of their complete domination of the members of the union and the absolute subserviency of those members to the will or caprice of the officers. The condition resulting from this system is but modified slavery. The juniors are no more than serfs, obedient to the will of the dictatorial officers of whom the business agent Kauffman is the supreme dictator. The position of the seniors, except the favored ones, is not much better.
As already stated, the practice of "arm work" will be enjoined; but no accounting of the moneys collected by the officers will be ordered as it is apparent that "arm work" was an institution fostered and acquiesced in by the full membership of the union notwithstanding relief from the evil system could have been obtained at any time by application *Page 239 
to this court. The complainants are themselves at least partly responsible for the condition of which they complain — some of them eagerly sought the privilege (?) of doing "arm work" to curry favor with the officers and gain advantage over their fellows and thus to defeat that equality of opportunity and community of interest which unionism is designed to preserve. Their hands are not altogether clean.
 3. EXTORTION
This complaint is based upon the contention of many of the junior members that they were required to pay certain officers of the local sums ranging from $100 to $600 as the price of being awarded certain motion picture operator jobs and that they were also required to "kick back" to the officers of the local a portion of their weekly salary ranging from $5 to $25 per week, according to the salary involved. Of course, this charge is vigorously denied by the officers, but the evidence supporting it is overwhelming and justifies the conclusion that it is well founded. It is true that some of the witnesses who testified to this species of extortion and graft are not of a character to inspire confidence in the truth of their testimony, but there were many witnesses who testified to similar acts of extortion whose testimony cannot be impeached; and on the whole the character of all of complainants' witnesses compares favorably with that of the defendants in the light of their admitted conduct. Further extortion will be enjoined, but no accounting of the payments thus made will be ordered, as complainants are inpari delicto and "it is the established rule that the law will not assist either party to an illegal contract. * * * it will leave them where it finds them." Cameron v. InternationalAlliance, c., supra. It is urged that as the public interest is here involved this case comes within the exception to the rule quoted. The exception is based upon "the reasons * * * that thepublic interest requires that relief should be given; and it is given to the public through the party." Story Eq. *Page 240 Jur. (14th ed.) § 421. The public interest is amply served by an injunction against a continuance of the unlawful practice; an accounting for the graft paid would benefit no one except guilty parties. The complainants knew that they were paying graft and the defendants knew that they were receiving graft. In making the payments the complainants were endeavoring to secure an unfair and unjustifiable advantage over their fellow members. The doctrine of clean hands also applies.
 4. CONTROL OF JOBS
It is admitted that the defendant local has a virtual monopoly of the moving picture operators' positions within its jurisdiction. It is not denied that the union controls the operators' jobs and that it is impossible for an operator to obtain a job in any of the motion picture theatres within its jurisdiction, and employing union labor, except upon assignment by the business agent. In actual practice, the business agent is the dictator and controls every such job. His word is law. The constitution of the local provides that "it shall be the duty of the business manager to furnish men for all positions when requested to do so." The theatre managers know from experience that they have to request the business manager to assign operators to their respective theatres. They are not permitted
by the local to deal directly. That the business agent appreciates his power under the constitution of the local in this regard is indicated by the following excerpt from the minutes of a senior meeting held May 8th, 1934, while the final hearing in this cause was in progress:
"The business manager stated that as long as he held the position of business manager he would give out the jobs and nobody else had any right to tell any man that he would go here or there unless it came from him." (See Exhibit D-14, page 85.)
The evidence shows conclusively that this power was exercised by the defendant Kauffman in a wholly autocratic and arbitrary manner. This complete control of positions was a *Page 241 
vital element in aiding the extortion already commented upon. In the assignment of jobs the desires of the employers and of the employes are of no moment. The testimony supporting the charge of arbitrary control of jobs by the business agent and the evidence generally discloses that the men who were paying graft or "working on the arm" usually had steady employment. It is too plain for argument that nominal control of jobs was in the local, and actual control in the business manager; and that the members of the local who have acquiesced in this practice have surrendered to the local and to its officers their right of freedom of contract of employment. This situation is similar to that condemned by the court of errors and appeals in Lo Bianco
v. Cushing, 115 N.J. Eq. 558, affirming this court on the opinion below.
Article 1, paragraph 1 of the constitution of this state provides that "all men are by nature free and independent, and have certain natural and unalienable rights among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property and of pursuing and obtaining safety and happiness."
In Walsche v. Sherlock, 110 N.J. Eq. 223, in commenting upon the above quoted language of our constitution, I said:
"Those unalienable rights being guaranteed by the constitution, any contract, unreasonably restrictive thereof, is necessarily void. I do not suggest that every contract restrictive of constitutional rights is void. Mutual advantages arising from such contracts equal to the burdens assumed or privileges curtailed may justify an individual in waiving constitutional rights. But those rights which the constitution recognizes as unalienable will be preserved by the courts notwithstanding individual contracts of waiver especially where the public interest is affected because that interest transcends the will or whim of the individual. This concern as to the public interest is what is known as `public policy.' The contracts of individuals containing restrictions upon unalienable rights which are of an oppressive nature, and operating generally in the community to prevent workmen from obtaining employment and from earning their livelihood will not, therefore, be countenanced." *Page 242 
That statement is fully supported by the authorities cited in that opinion. We now have the added authority of Cameron v.International Alliance, c., supra, in which our court of last resort has expressed itself on this point in no uncertain terms. And see, also, Lo Bianco v. Cushing, 117 N.J. Eq. 593. The restrictions upon the freedom of contract involved in Walsche
v. Sherlock were mild indeed in comparison to those involved here. It is against public policy that the individual should surrender his right of contract of employment — the right to the sale of his own labor — to any other individual or organization "except to the extent necessary to subserve the public interest."Cameron v. International Alliance, c., supra. This right "to have free opportunity to gain employment and to retain aposition of employment once it is gained, is as precious in the eye of the law as the right of the employer." Brennan v.United Hatters of North America, 75 N.J. Law 729. (Italics mine.) It is one of the property rights guaranteed by the fifth amendment to the federal constitution (Cameron v.International Alliance, c., supra), and is unalienable. Much less may the complainants be deprived of this right without their consent, except by constituted authority and in the public interest. In Lo Bianco v. Cushing, supra, a by-law of the union provided that all moving picture operators' jobs within the jurisdiction of the local were the property of the local itself. Here, while the claim is not expressed in any written by-law of the union, the practice is the same as there. Such a practice is but modified slavery. The instant cases present but new examples of that spirit of revolt by the rank and file of labor against autocracy and dictatorship within the union, exemplified inWalsche v. Sherlock, supra; Lo Bianco v. Cushing, supra, and Cameron v. International Alliance, c., supra. It is unfortunate, not only for labor, but for society in general, that such conditions as disclosed in these cases can exist. We are all, individually and collectively, irrespective of our trade or calling, more or less dependent upon labor. And generally speaking, it may be truthfully said that what will benefit labor will of necessity also benefit capital and is conducive to social welfare. And labor unions organized *Page 243 
and maintained for the equal benefit of their members, a purpose entirely lawful and laudable, are, without doubt, "conducive to the well being of society and a necessary part of the social structure." Cameron v. International Alliance, c.,supra. But this is so only when they are properly governed and pursue their lawful objects in a lawful manner. Otherwise, they may become a cancer on the social structure and impede social progress as effectively as they might advance it if prudently managed in a true spirit of democracy. Union autocracy, whether applied internally or externally, is equally reprehensible. Labor unions had their origin in the ancient guilds of foreign countries. In this country they were born of necessity arising from the unconscionable conduct of capital — of employers making virtual slaves of their employes. But the cure which was sought for these ills via the union has in many instances, of which the instant cases present a fair example, proved much worse than the disease itself. The ills have been increased and intensified many fold by the unconscionable conduct of the union officials and racketeering business agents. It is such unconscionable and unscrupulous conduct — persisted in by so-called labor leaders, business agents, c., in their lust for power and their own greed for the wealth which they vociferously condemn — that at times brings the labor union into disrepute. And it must not be overlooked that the rights of individuals, whether in or out of a labor union, as well as the respective rights of labor and capital, are relative only. Each must exercise his rights with due regard to the rights of others.
When labor learns to properly govern itself; when union leaders and business agents learn the essence of the golden rule; that enslavement of laborers to their autocratic and dictatorial whims is no less pernicious than the much decried and condemned enslavement of labor by capital, there will be less necessity for the intervention of the courts in labor disputes and controversies of this kind, and much less clamor, on the part of labor, against the injunctive power of equity — a power as necessary to protect labor from itself as from capital. There can be no "economic independence and security and *Page 244 
contentment of labor" so "essential for the public order and welfare" (Cameron v. International Alliance, c., supra) until the unscrupulous labor leader or business agent is shorn of his autocratic power. The solution of the problem lies with the rank and file of union labor itself.
The issue here is much deeper than appears upon the surface; it is not merely whether the bare acts of the officers complained of are wrong; it is whether the inherent right of the individual to work out his own destiny, declared by the constitution to be unalienable, shall be preserved; whether individuals are to be compelled to surrender to collectivism and collectivism in turn to dictatorship. It touches the very foundations of society. There can be but one answer to this issue. Once it is thoroughly understood the rank and file of labor will revolt against the assumed dictatorship of so-called labor leaders and of racketeering business agents and resume their right to individual effort and insist on the freedom of contract which is guaranteed them by the basic law of the land. Union labor may purge itself.
 5. UNLAWFUL DIVERSION OF UNION FUNDS.
Funds of a labor union are held in trust by its officers for the lawful purposes of that union. Diversion to an unlawful purpose is a breach of trust for which the officers are accountable. State Council, c., v. Sharp, 38 N.J. Eq. 24;Grand Lodge Knights of Pythias v. Germania Lodge, No. 50,56 N.J. Eq. 63, 73; 5 Pom. § 2358; 4 Pom. § 1432; Parr v.Lancashire and Cheshire Miners Federation (1913), 1 Ch.366. No accurate records of the financial affairs of the local for the years prior to 1931 were made available at the trial. It is claimed that the records up to March, 1931, were destroyed or lost as the result of a fire which occurred on March 29th, 1931. My conclusion from the testimony is that these records were not burned; and if they were lost they were lost voluntarily. Available records show that from January 1st, 1932, to June 30th, 1933, the *Page 245 
union took in $53,217.12 for its regular and emergency account and in addition the receipts of the union sick fund for the same period were $3,392.38. That an accounting of union funds should be decreed is indicated by the following facts: Since November 13th, 1928, Kauffman, the business agent, was paid a salary of $150 a week, but he was receiving $100 a week (or more) as salary from a theatre in which he did not work. Someone else worked for him "on the arm." He also has an allowance of $45 a month for his automobile. Two other officers have a monthly allowance of $25 each for theirs. In 1930, 1931 and 1932 business agent Kauffman was given a present of $5,000 out of the local treasury each year. Sums ranging from $500 to $2,500 have been paid to various officers from time to time to cover their expenses in attending conventions, without the requirement of an accounting, notwithstanding the fact that the International Alliance paid their traveling expenses and $10 a day for living expenses. Other officers have been the recipients of cash presents out of the treasury of the local amounting to $2,200 in 1931 and $3,500 in 1932. In 1931 Kauffman got another $1,000 ostensibly for services on a wage scale commission; other officers received $2,200 for like services. During the period covered by the receipts referred to $15,638.62 was paid to the officers as salaries; $10,800 as Christmas gifts and $3,550 for convention expenses; $2,338.05 for automobile and traveling expenses and $1,500 was contributed to the campaign fund of various candidates for the Newark city commission. The candidate who received the largest "campaign contribution" was the police commissioner who was up for re-election, but was defeated. Why this local should be so interested in a municipal election does not appear. Whether this disbursement was a proper application of trust funds is open to serious question. On the facts as they now appear the question would be answered in the negative. At about the time these proceedings were instituted $5,000 was paid out of the union treasury to a firm of New York attorneys, but for what purpose does not appear. They have had no part in this litigation. There will be an accounting. *Page 246 
 6. GROUP LIFE INSURANCE
Each member of the local, whether junior or senior, holds a certificate of the Metropolitan Life Insurance Company certifying that he is a "member of Motion Picture Machine Operators Union I.A.T.S.E. Local No. 244 and insured for $1,000" and that if his death occurs while "he is a member of said union * * * the amount of insurance in full on said member" will be paid to his beneficiaries. The premiums on this group insurance are paid out of the union treasury, the premium charged being the same for juniors as for seniors. Because of the uncertain financial condition of the local, fear was expressed by the complainants that this insurance might lapse for non-payment of premiums, hence discovery was sought. At least partial discovery concerning this insurance was made during the course of the final hearing. I assume that such discovery was satisfactory to the complainants, as the point is not stressed in their brief. If any additional discovery is necessary, it will be awarded.
 7. MISFEASANCE, MALFEASANCE AND GENERAL MISMANAGEMENT.
Sufficient has already been said to indicate that the charges of misfeasance, malfeasance and general mismanagement of the affairs of the local are well grounded. The statement in complainants' brief that "the present group of officers seems to constitute a strongly established dynasty," is justified. The defendant Kauffman has been business agent since 1920; the president, secretary and treasurer have occupied their respective positions for about the same length of time. The vice-president has been in office for eleven years. The incumbency of some members of the executive board and some trustees has continued for periods of from eight to ten years. No annual elections have been held for at least ten years. In 1926, by *Page 247 
resolution adopted by the senior members, the terms of all officers, except the business agent, was extended for five years. Kauffman's term was extended for ten years and in 1930 another five-year extension was granted. The business agent and secretary are, by virtue of their positions, perennial delegates to all conventions, with liberal allowances for expenses, as already shown. The perpetuation in office of these officers has been accomplished through the intimidation of the members and their fear of losing their jobs. There was testimony to the effect that the seniors were afraid to object in open meeting to the conduct of the union affairs, and a critical anonymous letter circulated among the members in 1933 brought forth abuse and threats against the unknown writer. Free and open discussion at the meetings of the members was not possible. At least one member was subjected to physical violence when he raised his voice in protest at a meeting. The record is replete with testimony indicating the complete domination of the members by the officers. Their continuation in office, as already stated, is the result of intimidation and fear. They have been guilty of bribery and extortion; and have proven themselves generally unworthy of the trust reposed in them. They were chosen by only a portion of the members, the seniors, to the exclusion of the juniors, and have perpetuated themselves in office by dictatorial and autocratic methods which should not be countenanced in any civilized community. Their continuance in office will be enjoined pending the election of new officers in which the full membership must have a voice, such election to be held under the supervision of a master of this court and a receiver to be appointed in the meantime. Carlin v. Drury, 1 Ves. B. (1812) 155; LocalNo. 11, c., v. McKee, 114 N.J. Eq. 555; Chalghian v.International, c., Local No. 617, 114 N.J. Eq. 497.
 8. CHARGES AGAINST MEMBERS
The facts already stated and many more contained in the record, which, for want of space, cannot be detailed here, indicate *Page 248 
very clearly that the pending charges were preferred against the complaining members because of their activities in connection with this litigation and in endeavoring to secure to themselves the rights and privileges to which they are entitled. It is contended that these members have no right to apply to this court for relief until the remedies within the organization, provided in the constitution and by-laws, are completely exhausted; but I think it is plain that there is no possibility of the accused members receiving a fair trial within the union even if the charges were justified. And where the pursuit of internal remedies "would be futile, illusory and vain" union members are justified in first appealing to a court of equity. Walsche v.Sherlock, supra. But aside from this fact, the present controversy (and the charges against the members grew out of this controversy) is not of a character to give the union tribunals exclusive jurisdiction. "These organization tribunals were designed to adjust controversies between the union and its members inter se strictly. Here the public is virtually a party, and the provisions in question therefore have no application." Walsche v. Sherlock, supra; Cameron v.International Alliance, c., supra. As to the jurisdiction of this court in the premises, see, also, Lo Bianco v. Cushing,117 N.J. Eq. 593; Polin v. Kaplan (New York Court ofAppeals), 257 N.Y. 277; 177 N.E. Rep. 833. The prosecution of these charges will be enjoined.
Decree accordingly. *Page 249