273 So.2d 912 (1973)
Louisiana STATE BOARD OF EDUCATION, Individually, and on behalf of the University of Southwestern Louisiana, Plaintiff Respondent,
v.
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Defendant Applicant.
No. 4191.
Court of Appeal of Louisiana, Third Circuit.
February 20, 1973.
Rehearing Denied March 21, 1973.
*913 Voorhies, Labbe, Fontenot, Leonard & McGlasson by J. Winston Fontenot, Lafayette, for defendant applicant.
Davidson, Meaux, Onebane & Donohoe by John Allen Bernard, Lafayette, for plaintiff respondent.
Before FRUGE, SAVOY and MILLER, JJ.
MILLER, Judge.
Applicant National Collegiate Athletic Association seeks to set aside the trial court's preliminary injunction restraining the NCAA "... from conducting any further proceedings or taking any other action whatsoever related to ..." its November 2, 1972 notice of inquiry directed to respondent University of Southwestern Louisiana. The injunction is in effect until August 15, 1973. NCAA moved for a suspensive and devolutive appeal, but the trial court granted only the devolutive appeal.
Pursuant to Rule XII, Uniform Rules of the Courts of Appeal, Vol. 8 LSA-Revised Statutes, NCAA applied for a writ of certiorari. The writ was granted to provide an expeditious hearing and determination of the matter. The delays incidental to an ordinary appeal would have denied a meaningful remedy to NCAA. Notwithstanding our efforts to provide a prompt hearing, our judgment may not become final for an additional forty-four days. Michigan Wisconsin Pipe Line Company v. Fruge, 201 So.2d 672 (La.App. 3 Cir. 1967); Discon v. Saray, Inc., 262 La. 997, 265 So.2d 765 (1972) footnote 4 at page 772.
The trial court was convinced that the NCAA was disregarding its own "Official Procedure Governing The NCAA Enforcement Program"; that USL was denied its right (under section 3 of the NCAA rules) to a hearing "... at a time and place which is mutually convenient"; that a January 3, 1973 notice to appear at a January 9, 1973 meeting in Chicago, Illinois was insufficient, particularly in light of the fact that NCAA was relying on undisclosed information obtained during an intensive twelve month investigation based in part on interviews with witnesses throughout the United States; and that USL would suffer irreparable injury because of "... the possible deprivation of the University of any TV or tournament funds to which they may or may not become entitled, by reason of any action of the NCAA ..." On these findings the trial court enjoined the NCAA from holding hearings related to all complaints against USL until August 15, 1973. No statutory or jurisprudential authority was cited to support this action. Indeed, USL's counsel has not cited statutory authority or jurisprudence from any jurisdiction which supports the trial court's action in enjoining a private voluntary association from holding a hearing to determine if one *914 of its voluntary members should be disciplined.[1] We reverse the trial court and dissolve the preliminary injunction.
USL makes a persuasive argument to support the trial court's judgment pointing out that it has not asked the court to consider the merits of the charges against USL. Instead USL asks only that the NCAA be compelled to adhere to its procedural requirements to the end that USL may be afforded reasonable notice and an opportunity to be heard. On the other hand NCAA has persuasively contended that the January 9 hearing was solely concerned with violations which USL had investigated and which were the basis for stringent restrictions imposed by USL on certain members of its athletic department, as reported October 9, 1972 by letter written by USL's president addressed to the NCAA. It further contends that all NCAA procedural requirements were complied with. We will not detail these arguments or make a determination of the issue of timely notice because the merits of these contentions are not properly before the court.
Respondent cites no authority in law or equity authorizing injunctive relief to prevent a disciplinary hearing by a private voluntary association. The jurisprudence construing LSA-C.C.P. Art. 3601[2] has carved out stringent prerequisites for the granting of this special remedy. The writ of injunction is a harsh, drastic, and extraordinary remedy which should only issue where the party seeking it is threatened with irreparable loss or injury, and is without an adequate remedy at law. Greenberg v. DeSalvo, 254 La. 1019, 229 So.2d 83 (1960), certiorari denied, Greenberg v. Dunker, 397 U.S. 1075, 90 S.Ct. 1521, 25 L.Ed.2d 809 (1970); Amacker v. *915 Amacker, 146 So.2d 672 (La.App. 1 Cir. 1962). Injunctive relief should not be granted unless facts supporting its justification are clear and convincing. Olsen v. City of Baton Rouge, 247 So.2d 889 (La. App. 1 Cir. 1971). Irreparable injury is that injury, loss or damage for which damages cannot be measured by a pecuniary standard. Danzie v. Rutland, 232 So.2d 303 (La.App. 2 Cir. 1970); McBride v. Duckworth, 232 So.2d 122 (La.App. 2 Cir. 1969).
The injunction was improvidently granted because USL failed to show irreparable injury. USL's allegations of injury were at best purely speculative and conjectural inasmuch as no hearing had taken place and no penalties had been imposed. The allegations in respondent's petition illustrate the prematurity of the trial court's actions.
USL alleged that if "... the hearing is held, and/or if any violations of NCAA regulations are determined by the Council and/or any penalties are assessed against the University, its personnel or student athletes, grievous and irreparable damage will be done to those persons and the Institution." This barest of allegations cannot be held sufficiently precise or compelling to sustain the harsh remedy of injunctive relief. There is no showing that if the hearing is held, USL will suffer injury, much less irreparable harm. It may very well be that USL will be completely exonerated of any wrong doing following a hearing by the NCAA. Until it is determined that a definite penalty will be imposed, the threatened irreparable harm is not imminent but is merely possible. If possibilities of irreparable harm were sufficient to serve as the bases for injunctive relief, courts could be called upon in the future to enjoin investigations by the NCAA of possible rule violations even before charges are made. The logical extension of USL's argument surely points in that direction. The sine qua non is infinite. It is for this reason that courts will only extend injunctive relief when irreparable injury is imminent. Standard Brands, Inc. v. Zumpe, 264 F.Supp. 254 (E.D.La.1967).
Courts will issue injunctions only when the irreparable injury is to rights which are the proper subject of judicial inquiry and protection. In this regard the trial court erred in taking jurisdiction of the dispute between USL and the NCAA.
Courts will not interfere with the internal affairs of a private association except in cases when the affairs and proceedings have not been conducted fairly and honestly, or in cases of fraud, lack of jurisdiction, the invasion of property or pecuniary rights, or when the action complained of is capricious, arbitrary or unjustly discriminatory. Elfer v. Marine Engineers Beneficial Association No. 12, 179 La. 383, 154 So. 32 (1934); Heuer v. Crescent City River Port Pilots' Association, 158 So.2d 221 (La.App. 4 Cir. 1963); Marino v. Waters, 220 So.2d 802 (La.App. 1 Cir. 1969); Sanders v. Louisiana High School Athletic Association, 242 So.2d 19 (La.App. 3 Cir. 1970), see also jurisprudence from other states noted at 242 So.2d 26, 27. And even in cases of fraud, oppression, bad faith or the violation of property or civil rights, the courts will not take jurisdiction unless the complaining member has exhausted such remedies as may be provided by the laws of the association itself. Elfer v. Marine Engineers Beneficial Association No. 12, 179 La. 383, 154 So. 32 at 34 (1934).
The general rule of non-interference has been consistently applied. The few cases in other states applying the exception involved either the deprivation of vested property rights protected by due process safeguards or instances of prior fraud, bad faith, or oppression which convinced the court that association proceedings against the member were undertaken purely for purposes of harassment. No such right is involved in the instant case, and no allegations of prior fraud are made. *916 The severest penalty which could be imposed on USL is expulsion from the NCAA and the restriction against participation in NCAA sponsored athletic events.
Federal and state courts have defined participation in athletics as a privilege not protected by Constitutional due process safeguards. Mitchell v. Louisiana High School Athletic Association, 430 F.2d 1155 (5 Cir. 1970). Marino v. Waters, supra. When presented with cases involving disciplinary proceedings of private athletic associations, courts of this state and of other states, have uniformly refused to interfere. Marino v. Waters, supra; Sanders v. Louisiana High School Athletic Association, supra, see cases from other states noted at 242 So.2d 26, 27.
The preliminary injunction was improvidently granted and is hereby set aside. Costs of court both at trial and on appeal are assessed to respondent Louisiana State Board of Education, Individually, and on behalf of the University of Southwestern Louisiana, except insofar as they are relieved from the payment of costs by the provisions of LSA-R.S. 13:4521.
Reversed and rendered.
FRUGÉ, J., respectfully dissents with reasons.
FRUGÉ, Judge (dissenting).
The National Collegiate Athletic Association, applicant, (hereinafter referred to as NCAA) seeks to have this Court set aside the lower court's preliminary injunction restraining it from conducting proceedings against a member of the NCAA, the University of Southwestern Louisiana (hereinafter referred to as member) until August 15, 1973.
The NCAA applied for a writ of certiorari and took a devolutive appeal. Upon finding that delays incidental to an ordinary appeal would have caused applicant irreparable injury, this Court granted the writ of certiorari.
At the hearing in the lower court the NCAA filed in evidence a copy of the "Official Procedure Governing The NCAA Enforcement Program". The procedure provides for a Committee on Infractions, whose purpose it is to assemble facts for the NCAA's Council. The Committee conducts a preliminary inquiry in order to determine whether there is sufficient evidence justifying an official inquiry. Section 3 of the Procedure provides that if the Committee determines that an allegation justifies an official inquiry, "it shall direct a letter to the chief executive officer of the member involved, fully informing him of the matter under inquiry" and calling upon the chief executive officer for disclosure of germane information. A proviso allows the Committee to require the appearance of a respresentative of the University concerned to appear before the Committee at a time and place "which is mutually convenient"; a member subject to inquiry shall, upon its request, be given the opportunity to have representatives appear before the Committee.
Section 4 provides that the Committee shall submit a written summary statement to the Council on each case that has been subject to an official inquiry, and if a violation is found for which the Committee recommends that the Council impose a penalty, a full report shall be submitted to include various items specifically set forth. Section 4 further provides, in Subsection (b):
"The report of the Committee, less its recommendations if such are made, shall be made available to the member involved and it shall be notified that it is entitled to appear before the Council to challenge the findings of fact and the evidence upon which the report is based, to produce additional evidence and to argue such matters of Association Law as may be involved. The Council shall not act upon the report of the Committee until the report has been forwarded to the member involved and the member has had an opportunity to appear before the Council." (Emphasis ours).
*917 In summary, under the official procedure, the Committee first conducts a preliminary inquiry, then if deemed justified by the Committee, an official inquiry is begun by notification by letter fully informing the school involved of the allegations, and an opportunity to respond to the charges. At the conclusion of the official inquiry, the Committee makes a report to the Council (a copy of the report must be sent to the member involved) and the member involved must be afforded the opportunity to appear before the Council to challenge the Committee's findings and evidence upon which the report is based and "to produce additional evidence."
If the rules of the NCAA are to provide an opportunity for the member to appear and defend itself, implicitly therein, the member school must be given a reasonable opportunity to defend itself.
Member alleges that the NCAA was not abiding by its own procedures, therefore, the chronology of events of necessity must be examined.
In the early part of 1971, the NCAA Committee on Infractions received reports of alleged violations by member. The member's Athletic Director, A. G. Urban, was notified on October 18, 1971, by the Committee on Infractions that it was conducting a preliminary inquiry into the athletic policies of member (See Exhibit #1). Charges of violations were not designated in this letter.
On October 9, 1972, by letter addressed to Warren Brown, Assistant Executive Director of the NCAA, (who is also secretary of the Committee on Infractions) and by letter dated October 24, 1972, addressed to the Athletic Committee of Louisiana State Board of Education, President Rougeou stated that member had conducted a review on and in the immediate vicinity of the campus and had taken action as outlined in the letter based on this review. This letter expressly stated at page 3:
"The University does not wish to assess, for any of the irregularities uncovered in its investigation, a degree of culpability of any particular member of our athletic staff, past or present, or of individuals not directly associated with the athletic program of the University."
This statement was preceded by information revealing that the Director of Athletics and two basketball coaches were placed on probation along with the imposition of listed restrictions. In order to dispel notions that this letter was an admission of guilt by member, no specific findings of violations were made as to any particular coach, member employee, member studentathlete, or any other person.
Paragraph 10 of the Petition For Preliminary Injunction, verified by sworn affidavit of President Clyde Rougeou, shows that the member took the action it did in an effort to exemplify good faith toward the NCAA and comply with the basic objectives of the NCAA. President Rougeou clearly stated that member took the action without completing a full investigation and without interrogating any of the essential witnesses or persons involved in the allegations; the action was taken in order to conform with certain precautionary action by setting forth internal university guidelines and prohibitions for the members of the member Athletic Department.
Warren Brown on November 2, 1972, addressed a letter to President Rougeou informing him that "the Committee has investigated the charges filed and has found them to be of sufficient substance and reliability to warrant an official inquiry." (See Exhibit #1). Attached thereto was a document titled "Official Inquiry" comprised of 31 single-spaced typewritten pages of allegations involving a large number of individuals residing throughout the United States. This letter was received by President Rougeou on November 8, 1972. The Committee directed (1) that member file detailed responses to the charges no later than December 13, 1972, and (2) that on December 19, 1972, the Committee would meet in Fort Lauderdale, Florida, at *918 which time member's response to the charges would be considered.
The record reveals that member was afforded no election regarding the date, time, and place, of the meeting to take place in Fort Lauderdale, Florida, despite the requirement of Section 3 of the Official Procedure that the appearance of the school be "at a time and place which is mutually convenient". Additionally, the letter of November 2, 1972, is the only letter that member received notifying it of an official inquiry as required by Section 3 of the Official Procedures.
Following the receipt of the Official Inquiry letter, the member commenced an abbreviated inquiry into the charges. However, for reasons stipulated in the letter of November 30, 1972, (addressed to Mr. Brown from President Rougeou) the member alleged that it was impossible to make an adequate investigation and file suitable responses to the charges within the allotted time, and an extension of time was requested. In support of this prayer, the following reasons, inter alia, were specified:
(1) the individual referred to in the allegation had to be contacted and these were so numerous and resided in various parts of the United States so that locating and interrogating them would be difficult;
(2) the members of the athletic staff and the student-athletes allegedly involved who must be interrogated and whose assistance would be required in investigation of the various charges were presently engaged in season competition;
(3) activities of member involving school matters and the Louisiana State Board of Education matters, including preparation of the budget request, preparation for final exams, etc., made it impossible for the member to give proper attention to the NCAA inquiry;
(4) unrest at the campuses at the various state universities due to the incidents that have occurred at Southern University required the constant attention of the members of the Administrative and Security Staff; and
(5) the large number of allegations and the complexity of the alleged violations demonstrated that considerable time and effort was expended by the NCAA in its investigation and that member should be provided with ample opportunity to rebut these allegations.
By letter dated December 6, 1972, Mr. Brown notified President Rougeou that the Committee has approved member's request for a delay to respond to the official inquiry; member was granted until March 1, 1973, to respond to the charges. (See Exhibit #3). In this letter, the NCAA directed that the member send representatives to appear before the Committee at its December 19th meeting at Fort Lauderdale, Florida, in order to explain the disciplinary action previously taken by the member. Inasmuch as President Rougeou was engaged in out-of-town activities on behalf of member, he phoned the NCAA and requested that member not be compelled to appear on such short notice. He explained that because of the incompleteness of the member's own investigation, a great deal of additional information would necessarily be required in order to properly explain the precautionary action taken by the University.
Despite the telephone request, the NCAA insisted that member representatives appear at the December 19th meeting. This action was taken despite the requirement of Section 3 that such meeting be held at a "mutually convenient time and place".
It is important to appreciate that there is nothing in the letter of December 6 indicating that the letter is to constitute an Official Inquiry or that any additional charges (apart from the ones included in *919 the "Official Inquiry" of November 2), were being asserted against the member.
In a further effort to display constancy toward the NCAA, the member dispatched three employees to the December 19th meeting at Fort Lauderdale; their mission was to impress the Committee with the necessity for granting member reasonable time within which to investigate the allegations.
On January 3, 1973, President Rougeou received a letter forwarded to him by the Committee and referred to as the "NCAA Committee on Infractions Report of Case No. 390" (See Exhibit #4). The letter stated that the enclosed "document sets forth the results of the Committee's inquiry into certain athletic policies and practices of the University of Southwestern Louisiana;" that the report was being forwarded in accordance with Section 4 of the Official Procedures; and that the report would be submitted to the NCAA Council meeting in Chicago, Illinois, on January 9, 1973.
It is important to note that the letter which advised member that it could make a presentation of its case in Chicago on January 9, 1973, was received only six days prior to the meeting (or on January 3, 1973).
The Case Report detailed numerous "violations of NCAA requirements or questionable practices in light of NCAA requirements as determined by Committee". In addition, the report listed "supportive evidence" that the Committee submitted in corroboration of its findings; including memoranda by investigators for the NCAA of 33 separate witness interviews conducted in a period of over a year and a half. After remarking that the evidence listed did not represent all of the information collected by the Committee for this individual case, the letter stated that the findings related only to those irregularities already allegedly admitted by the member in October, 1972. Attention was directed to Section 5 of the Official Procedure providing, in part, that "previous violations of NCAA legislation shall be contributing factor in determining the degree of penalty". Apparently, this in reference to a previous period of probation assessed against the member.
Upon receipt of this letter on January 3, 1973, officials of member immediately determined whether or not there would be an opportunity to thoroughly and adequately make a presentation before the Council on January 9, 1973. They concluded that this would be impossible and accordingly notified the governing authority of the University, the State Board of Education. On January 4, 1973, the Attorney General for the State of Louisiana, telephoned and wired representatives of the NCAA; he once again requested a delay of the proposed hearing until at least March 1, 1973 the date the NCAA had previously agreed upon. The NCAA responded negatively and this suit was filed wherein request was made that the District Court enjoin the NCAA from further proceedings against member until December 31, 1973. The District Court declined to do so and instead enjoined proceedings until August 15, 1973.
In oral reasons, the District Judge stated that the NCAA was disregarding its own "Official Procedure Governing the NCAA Enforcement Program;" that member was denied its right under Section 3 of the NCAA rules to a hearing "at a time and place which is mutually convenient;" that "the University would have been in some respect required to answer various allegations as well as the ten which were supposedly to be heard at that time"; that the notice to appear at the January 9th meeting was insufficient; and that "the court can easily see" that requiring member to appear without sufficient time to investigate the allegations would cause irreparable injury.
In answer to the NCAA's contention that the hearing on January 9th was to be directed only to those charges which member allegedly had admitted, respondent, in brief, submits the following:
"Even aside from the fact that, as shown by the Petition for Injunction *920 verified by sworn affidavit of President Rougeou, the action taken by the University evidenced by those two letters was precautionary action, done without complete investigation or the interrogating of the essential witnesses, it is clear that the NCAA contention is without merit. The charges detailed in the Case Report go far beyond USL's letters of October 9 and October 24, 1972. The charges in the Report are directed against specifically named coaches, athletes, and other persons, including even prominent citizens of Lafayette not connected with USL. The charges go beyond matters referred to in the letters of October 9 and October 24, 1972, and contain details nowhere referred to in the said letters. Further, the Committee relies for substantiation of its charges not only on the supposed admissions of USL, but also on numerous memoranda of interviews conducted by the NCAA investigators with various witnesses." (Emphasis ours).
Member contends that it makes no difference whether the charges contained in the Case Report are among the charges contained in the Official Inquiry for, regardless, the NCAA has violated its own procedural safeguards:
"If the Case Report charges are among those contained in the Official Inquiry, then the action of the Committee in filing the case Report and that of the NCAA in scheduling a hearing before the Council on the said Report are in violation of the NCAA's agreement, contained in the letter of December 6 addressed to President Rougeou by Mr. Brown, in which USL was granted an extension until March 1, 1973, to respond to the charges in the Official Inquiry. On the other hand, if the charges contained in the Case Report are not included among the charges contained in the said Official Inquiry, the NCAA has violated its rules of procedure, because, under the Official Procedure, a prerequisite to submission of a Case Report and the holding of a hearing before the Council is the undertaking of an official inquiry, including, under Section 3, the addressing of an official inquiry letter to the chief executive officer of the member involved, notifying him of the charges, and the affording to the member an opportunity, at a mutually convenient place and time, for appearance before the Committee. The letter of December 6, 1972, is not an Official Inquiry letter. There is nothing in the Official Procedure that authorizes a failure to comply with the requirements of Section 3 simply because a member may have taken action on its own." (Emphasis ours).
Respondent additionally contends that regardless of whether the charges contained in the Case Report received by member on January 3, 1973, are among the charges included in the Official Inquiry, the fact still remains that once a Case Report is submitted to the Council, the member involved must be afforded a reasonable opportunity to appear before the Council to challenge the findings of fact and the evidence upon which the report is based and to produce additional evidence. In this regard, I find that the purpose of a hearing before the Council is not restricted to whether or not the member institution is guilty of the alleged violations; the question as to severity of the penalty is also considered. Therefore, even if the imposition of a penalty would have been warranted, member would nevertheless be entitled to a reasonable opportunity to introduce mitigating evidence.
Applicant contends the injunction was improperly issued inasmuch as (1) the member's allegations of injury were speculative and conjectural, and (2) member had not exhausted its administrative remedies.
In regard to the first allegation by applicant, LSA-C.C.P. art. 3601 provides:
"An injunction shall issue in cases where irreparable injury, loss, or damage may otherwise result to the applicant, *921 or in other cases specifically provided by law." (Emphasis ours).
Apparently applicant misconstrues Article 3601: member carried the burden of proof and convinced the District Judge that it may suffer grievous and imminent irreparable damage unless it received injunctive relief. Member proved to the satisfaction of the District Judge that it was confronted with imminent harm; not mere conjecture or speculation.
Trial judges are vested with much discretion in determining whether to grant or refuse an injunction. Melancon v. Assumption Parish Police Jury, 231 So.2d 690 (La.App. 1st Cir., 1970); Silberman v. Beaubouef, 175 So.2d 873 (La.App. 3rd Cir., 1965); National Car Rental System, Inc. v. City of New Orleans, 160 So.2d 601 (La.App. 4th Cir., 1964). The wellsettled jurisprudence of this state is that this discretion will not be interfered with unless the action of the District Judge is manifestly arbitrary. Melancon, supra; and Brunning v. City of New Orleans, 152 La. 989, 94 So. 909 (1922).
In Melancon, supra, the burden of proof applicable for a preliminary injunction was clearly explained as follows:
"A preliminary injunction is interlocutory in nature, designed to preserve the status quo until a determination can be made on the merits of the controversy. It may issue on a prima facie showing by the plaintiff that he is entitled to the relief sought, and that he would suffer irreparable injury if it is not granted. Ridge Park v. Police Jury of Jefferson Parish, 210 La. 351, 27 So.2d 128 (1946); Cloud v. Dyess, 172 So.2d 528 (La.App. 3 Cir., 1965)." (Emphasis ours).
In West v. Winnsboro, 252 La. 605, 211 So.2d 665, the Louisiana Supreme Court was concerned with the requirement of irreparable injury. Therein the Supreme Court stated an injunction is an equitable remedy available to a plaintiff, under C.C.P. Article 3601, who is without an adequate remedy at law. The Supreme Court defined "adequate remedy at law" as follows:
"By adequate remedy at law is meant one which is as speedy, efficient, and complete as the remedy in equity. See Banjavich v. Louisiana Licens. Bd. for Marine Divers, [237 La. 467, 111 So.2d 505], supra; de Funiak, Handbook of Modern Equity § 5, pp. 9-10 (2d ed. 1956); McClintock on Equity § 43, p. 103 (2d ed. 1948); 27 Am.Jur.2d, Equity, § 94, pp. 616-617; and 28 Am.Jur., Injunctions, § 39, pp. 534-535.
"The test is correctly stated in 28 Am.Jur., Injunctions, § 39, p. 534, as follows:
"It is not enough that there is a remedy at law. The remedy, to preclude injunction, must be certain and reasonably prompt, and as practicable and efficient to the ends of justice and its administration, both in respect of the final relief and the mode of obtaining it, as an injunction would be.'" (Emphasis ours).
It is settled that this Court will not interfere with orderly proceedings in the trial court in the absence of a showing of irreparable injury. Certainly, the alleged irreparable injury that the NCAA contended that it would suffer should the judgment of the District Court not be reviewed on writs (in lieu of the ordinary course by appeal) is much more conjectural and speculative and much less serious and severe than that which would have resulted to member, its coaches and student athletes, if the injunction had not been granted by the District Judge.
In regard to the second contention by applicant, that member had not exhausted its administrative remedies, see Davis, Administrative Law Treatise (1958), § 20.01, page 56; 6 Am.Jur.2d., Associations and Clubs, § 28 and § 29 and case cited therein.
Courts do not require exhaustion of administrative remedies when it is shown that such procedure would have been futile, illegal, *922 inadequate, or unfair. Martin v. Kansas City Southern Ry. Co., 197 F.Supp. 188 (W.D.La., 1961); Feinblum v. Louisiana State Board of Optometry Examiners, 97 So.2d 657 (La.App. 1st Cir., 1957); and Rogers v. Louisiana State Board of Optometry Examiners, 126 So.2d 628 (La.App. 3rd Cir., 1961). In Michell v. Louisiana State Board of Optometry Examiners, 128 So.2d 825 (La.App. 3rd Cir., 1961), the court stated the following:
"Although the general rule is, as stated, that a party must exhaust his administrative remedies before applying to the courts for relief, this rule is subject to flexible exception, where there is a sufficient showing of the inadequacy of the prescribed administrative relief and of threatened substantive prejudice if the petitioner is relegated solely to the administrative remedy, especially where there are substantial allegations that the administrative agency's actions are upon their face without legal or constitutional authority." (Emphasis ours.)
Applicant maintains that the preliminary injunction was granted to prevent a hearing which might or might not result in the imposition of penalties. In support of this position Elfer v. Marine Engineers Beneficial Association No. 12 et al., 179 La. 383, 154 So. 32 (1934) is cited wherein the court said that even in cases of fraud, oppression, or bad faith, the courts will not take jurisdiction unless the complaining member has exhausted such remedies as may be provided by the laws of the association itself. After careful study of the Elfer case, supra, we find that this statement was merely dictum in view of the Supreme Court's finding that "the proceedings leading up to plaintiff's expulsion from the defendant association were regular and in strict conformity to the constitution and by-laws of the organization." 154 So. 34. In connection with applicant's contention see: Roush v. Hodge, 193 Kan. 473, 394 P.2d 101 (1964); Junkins v. Local Union No. 6313, 241 Mo.App. 1029, 271 S.W.2d 71 (1954); Mursener v. Forte, 186 Or. 253, 205 P.2d 568 (1949); Medical Society of Mobile County et al. v. Walker, 245 Ala. 135, 16 So.2d 321 (1944); Collins v. International Alliance of T.S.E., 119 N.J. Eq. 230, 182 A. 37 (1935); and Walsche v. Sherlock, 110 N.J.Eq. 223, 159 A. 661 (1932).
Applicant cites a series of cases in an attempt to show that actions taken by a voluntary association are subject to judicial interference only where there is fraud, oppression, or bad faith, or where the laws of society or the law of the land is illegal. In all of those cases, the plaintiffs were asking the courts to pass on the merits of the action taken by the various associations involved. In all of the enumerated cases, the actions had been taken by the associations involved in complete accordance with the procedural rules of the associations; the actions were taken only after fair notice and a fair opportunity to be heard. "We are satisfied from our examination of the record that the proceedings leading up to plaintiff's expulsion from the defendant association were regular and in strict conformity to the constitution and by-laws of the organization", Elfer v. Marine Engineers Beneficial Association No. 12, 179 La. 383, 154 So. 32 (1934); "the Board of Directors acted in accord with the charter and bylaws of Defendant, after due notice and ample opportunity given Plaintiff to explain the charges against him", Heuer v. Crescent City River Port Pilots' Association, 158 So.2d 221 (La.App. 4th Cir., 1963); "In every instance the rule was applied fairly, consistently, and strictly", Marino v. Waters, 220 So.2d 802 (La.App. 1st Cir., 1969); "In the instant suit there has been no suggestion of fraud or dishonesty on the part of the Executive Committee... and we find nothing in the record to show that its ruling was capricious or discriminatory", Sanders v. Louisiana High School Athletic Asso., 242 So.2d 19 (La.App. 3rd Cir., 1970); "It is not contended the board acted corruptly", Morrison v. Roberts, 183 Okl. 359, 82 P.2d 1023 (1938); "In the instant case there is no *923 evidence of fraud, collusion or that the defendants acted unreasonably, arbitrarily, or capriciously", Robinson v. Illinois High School Association, 45 Ill.App.2d 277, 195 N.E.2d 38 (1963); "The respondents do not allege any mistake, fraud, or collusion", State ex rel. Ohio High School Athletic Ass'n v. Judges of Court of Common Pleas, 173 Ohio St. 239, 181 N.E.2d 261 (1962); and "There is no showing the proceedings before the Board were not pursuant to the rules of the Association", Tennessee Secondary School Athletic Association v. Cox, 221 Tenn. 164, 425 S.W.2d 597 (1968).
I agree with applicant that the general rule in this state is that courts will not interfere with the internal affairs of an association so as to settle disputes between the members on questions of policy, discipline, or internal government. However, I note that the District Judge applied the well-settled exception to that general rule: courts will interfere if the association's rules are not fairly and honestly administered.
Considering the evidence as a whole, I find the NCAA's action to have been arbitrary, capricious and unreasonable. After careful examination of the Official Procedure, I find no authorization for "piecemeal reporting" regarding charges contained in an Official Inquiry. Applicant has not brought to the Court's attention any other case in which a fraction of the violations charged have been scheduled to be heard on an intermittent basis. I find the clear import of the Official Procedure to be that allegations against a member institution should be heard and disposed of in a single proceeding; proceeding against a member school in a "piecemeal" manner discriminates against the institution. In the letter received by member on January 3, 1973, the NCAA advised that even though it was going to consider some charges against member, and perhaps take certain action detrimental to member and persons involved therewith, it still reserved the right to bring up additional charges on March 1, 1973. At the hearing on the preliminary injunction it was stated that in other instances certain schools have been given two and three years in which to respond to charges. Tr. 7. Member has to asked any court to consider the merits of the alleged violations; it asks only that the NCAA be compelled to adhere to its procedural requirements to the end that it may be afforded a reasonable notice and opportunity to be heard.
I am careful to keep in mind at all times the great weight which attaches to the findings by the trial judge. In this instance, the ultimate question is whether the trial judge committed manifest error in its findings. I am unable to find such in the present record. I think the trial judge acted within the bounds of his discretion in granting the preliminary injunction.
For the foregoing reasons, I find the judgment of the District Court and the injunction granted pursuant thereto should have been affirmed.
NOTES
[1] The dissent cites two trade union cases from other states wherein disciplinary hearings were enjoined. We distinguish the cited cases as inapplicable to the factual situation here presented. Each case involved a finding by the respective court that the disciplinary proceeding was undertaken fraudulently and in bad faith for purposes of oppression. In Junkins v. Local Union No. 6313, Communication Workers of America, 241 Mo.App. 1029, 271 S.W.2d 71 (1954), the union was enjoined from re-trying a member after the original conviction by the union on the same charge had been vacated. The court found "... that the charge involved here was beyond the scope and powers of the union to file and an attempt to re-try plaintiff was fraudulent and oppressive and showed bad faith on the part of the union." In Collins v. International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada, 119 N.J.Eq. 230, 182 A. 37 (1935), the court found officers of the union were actively engaged in (1) extortion, (2) malfeasance in office, and (3) unlawful diversion of union funds. After listing and discussing the enumerated wrongdoings, the court concluded that the officers of the union instituted charges against the complaining members because of their activities in support of the law suit against the union. The court held, moreover, that the controversy was not one strictly between the union and its members, but involved third persons. As a consequence, the court had concurrent jurisdiction over the dispute.
[2] "Art. 3601.

An injunction shall issue in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases specifically provided by law; provided, however, that no court shall have jurisdiction to issue, or cause to be issued, any temporary restraining order, preliminary injunction, or permanent injunction against any state department, board or agency, or any officer, administrator or head thereof, or any officer of the State of Louisiana in any suit involving the expenditure of public funds under any statute or law of this state to compel the expenditure of state funds when the director of such department, board or agency, or the governor shall certify that the expenditure of such funds would have the effect of creating a deficit in the funds of said agency or be in violation of the requirements placed upon the expenditure of such funds by the legislature.
During the pendency of an action for an injunction the court may issue a temporary restraining order, a preliminary injunction, or both, except in cases where prohibited, in accordance with the provisions of this Chapter.
Except as otherwise provided by law, an application for injunctive relief shall be by petition."